Cora GRAHAM, natural parent and best friend of Geraldine Graham, a minor, et al., Plaintiffs,

v.

Owen KNUTZEN, Superintendent of the Omaha Public Schools, et al., Defendants.

Civ. No. 72-0-266.

United States District Court,
D. Nebraska.

Oct. 13, 1972.

Robert V. Broom, Robert S. Catz and Vard R. Johnson, Legal Aid Society, Omaha, Neb., for plaintiffs.

Edmund D. McEachen, Young, Baird, Holm, McEachen, Pedersen, Hamann & Haggart, Omaha, Neb., for defendants.

DIER, District Judge.

The complaint of the plaintiffs raises apparent constitutional issues. Plaintiffs proceed *in forma pauperis*.

The Court allowed evidence to proceed piecemeal initially concerning the urgency alleged, and has continued periodically to hear evidence covering not only matters for a temporary restraining order, but for a preliminary and permanent injunction and for declaratory relief, and has considered all of the evidence touching to the "class action" claim, as well as alleged civil rights violations. Thus, the Court has considered every one of the elements and theories of the prayer of the plaintiffs' complaint.

Plaintiffs have just recently filed notice that they have no further evidence of any kind to offer in support of any elements of their complaint, and defendants have rested any further presentation.

## THE PLEADINGS AND JURISDICTION

This matter came on for hearing before the Court upon the complaint of three school-age children and their mothers against the Superintendent of the School District of Omaha, Owen Knutzen, the members of the Board of Education of the Omaha School District, and three principals in the Omaha Public Schools, Mr. Harold Reeves, principal of Omaha North High School, Clarence Barbee, principal of Horace Mann Junior

High School, and Miss Ida Gitlin, principal of Indian Hill Elementary School.

The complaint sounds in civil rights and seeks a declaratory judgment "that suspensions of students for extended periods of time without any prior notice or fair and proper hearing are unconstitutional" in that their result is to deprive "plaintiffs of their fundamental right to education without due process of law, as required and guaranteed by the Fourteenth Amendment to the United States Constitution." Plaintiffs allege that "suspensions of students for extended periods of time without any prior notice or fair and proper hearing" are had by the defendants pursuant to Sections 6.7 and 3.28e of the Policies and Regulations of the School District of Omaha.

Plaintiffs allege that Sections 6.7a and 3.28e of said Regulations, which they interpret as setting forth the grounds for exclusion from school "on their face and as applied are void for vagueness and, therefore, violate Plaintiffs' constitutional rights to due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States."

Such claims appear to present a proper case for declaratory relief under 42 U.S.C.A. § 1983 and 28 U.S.C.A. §§ 2201 and 2202. Jurisdiction is conferred by 28 U.S.C.A. § 1343(3).

■ The law of the State of Nebraska, Section 79–449, R.R.S.Neb.1943, provides that a suspension of a student from school " * * * shall not extend beyond the close of the school semester * * *." However, the fact that the minor plaintiffs are no longer under the disability of a suspension from the Omaha Public Schools does not render the case moot. See Esteban v. Central Missouri State College, 415 F.2d 1077, 1079, n. 1 (8 Cir. 1969).

The plaintiffs' complaint further alleges that: " * * * Defendants intend to, and will, continue their present unconstitutional suspension policies and practices, unless the Court orders said unconstitutional policies and practices to cease."

The correctness of the procedures followed in the suspension of minor plaintiffs from the schools they attended has been alleged by the defendants' answer. Cf. Torres v. New York State Department of Labor, 318 F.Supp. 1313, 1316 (S.D.N.Y.1970). The time for decision of this issue is, therefore, pressing.

The plaintiffs' complaint seeking a temporary restraining order, and mandatory injunction was filed on May 17, 1972. On May 19, 1972, plaintiffs' motion for a temporary restraining order was filed. On May 24, 1972, the Court held a hearing on plaintiffs' motion for a temporary restraining order. The complaint also sought to restrain the defendants from denying minor plaintiffs' immediate access to their respective schools. It requested they be returned to school until each of the individual minor plaintiffs had been provided a hearing before an *impartial* hearing officer. The contention of the plaintiffs was that the minor plaintiffs would be irreparably harmed if the schools which had suspended them did not allow their return for the eight days of the school year remaining. It was contended by plaintiffs' counsel that the failure of the Court to enter a temporary restraining order at this time would effectively deprive the plaintiffs of an entire semester of their education.

■ The Court found this to be unsupported. On May 24, 1972, it was judicially noted by the Court that, at most, fewer than ten actual class days remained in the then-present school term. Two of the minor plaintiffs had not attended school since March 29, 1972, and the third minor plaintiff had not attended school since February 25, 1972. The filing of a complaint requesting a temporary restraining order on May 19, 1972, came with their absence already long in existence. Irreparable injury cannot, therefore, have occurred because of the plaintiffs' absence from school for the last several days of the term.

At the initial hearing, it became evident that "class action" was in issue, and it became further evident that the system used by the schools deserved scrutiny more importantly than individual mistaken judgment error in isolated instances unless the evidence would support such instances as standard procedures.

The Court stated its concern to counsel that it wanted evidence on violations, if any, on procedural due process. *Cf.* Federal Rule of Civil Procedure 23(c)(4)(A). If the evidence should show systematic violations of due process, injunctive relief would be forthcoming. In the event that the system utilized by the defendants was determined to be procedurally adequate, then the Court should proceed to consider the cases on the question of whether there had, nevertheless, been a deprivation of the rights secured to the plaintiffs under 42 U.S.C.A. § 1983.

At this time the Court, after the initial hearing, denied plaintiffs' motion for a mandatory order returning the minor plaintiffs to school. The benefit to the plaintiffs of immediate return to school, as opposed to the possible effect on the defendants' school operation, required further evidence on which to make a fair decision.

The crux of the individual positions of the parties appear from the following excerpts of the pleadings. With regard to the allegations "that suspensions of students for extended periods of time without any prior notice or fair and proper hearing are unconstitutional", the plaintiffs' complaint states:

24) Plaintiff GERALDINE GRAHAM has been expelled from North High School since on or about March 29, 1972, without having received any form of proper hearing before an impartial hearing officer or tribunal with the opportunity to face her accusers and to present evidence on her behalf.

\* \* \* \* \* \*

29) Plaintiff PRATT has remained suspended from the Omaha Public School System from March 29, 1972, to date, without having received a hearing before an impartial hearing officer and without the opportunity to confront all of his accusers and to present all the evidence on his behalf.

\* \* \* \* \* \*

32) Plaintiff GEORGE COOPER-RIDER has remained suspended from Indian Hills School for over three months, (from on or about February 11, 1972, to date), without having received any form of prior notice or a proper hearing, and Defendant GITLIN has refused to discuss his return to school with his mother.

\* \* \* \* \* \*

36) It is a widespread invidious practice among Defendants and their agents to suspend class Plaintiffs for extended periods of time, and thereby deprive them of education, without providing:

a) Notice of the specific reasons for the suspension;

b) Notice of the "nature of the evidence" against the suspended student;

c) Notice of the right to a hearing before an impartial hearing officer or tribunal;

d) Notice of the right to appeal to the Board of Education;

e) A fair hearing before an impartial hearing officer with the opportunity to present a defense, to confront witnesses against the student, and to have legal counsel or other representative present; and

f) A notice and a hearing "before" the suspension takes effect.

\* \* \* \* \* \*

39) On information and belief, Plaintiffs believe that Defendants intend to, and will, continue their present unconstitutional suspension policies and practices, unless the Court orders

said unconstitutional policies and practices to cease.

Plaintiffs further state that Section 6.7a and 3.28e of the Policies and Regulations of the School District of Omaha violate their rights to due process of law. The pertinent parts of said Rules and Regulations are:

6.7a. No pupil shall be barred from school attendance except by temporary suspension approved by the principal. No set time for suspension is permitted. In every instance the principal shall take active steps to return the pupil to school as quickly as possible. Expulsion of pupils from school is not permissible without the approval of the office of the Superintendent of Schools.

b. Expulsion and suspension may be used as a means of punishment only in the most severe offenses.

3.28e. In his relationship to the pupils in his building, the principal shall have the power to suspend pupils temporarily at any time. Such suspension shall require that parents or guardians and the office of the Superintendent of Schools be notified at once. In matters of attendance and suspension, the principal shall work closely with the visiting teachers in order to enforce the requirements of the compulsory attendance laws. (Section 6.7).

Plaintiffs conclude:

42) Board Policy and Regulations Sections 6.7 and 3.28e., which set forth grounds for exclusion from school, on their face and as applied, are void for vagueness and, therefore, violate Plaintiffs' constitutional rights to due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

43) Board Policy and Regulations Sections 6.7 and 3.28e., are so vague and indefinite that they are the subject of continuous arbitrary and capricious abuse, and, therefore, violate Plaintiffs' constitutional rights to due process of law as guaranteed by the Four-teenth Amendment to the Constitution of the United States.

In their prayer, plaintiffs ask:

1) Immediate return of the plaintiff students to specific schools until a "proper hearing before an *impartial hearing officer*" (italics ours) is held.

2) Preliminary and permanent injunctions on behalf of the class of any suspension beyond five days, unless authorized pursuant to proper notice and hearing.

3) An expungement from school records of entries relating to the suspension of the three plaintiffs and all "those similarly situated."

4) The Board of Education be required to promulgate proper Rules and Regulations stating "specific standards of conduct" which might lead to expulsion or suspension.

5) That a procedure be established requiring a *"hearing before an impartial hearing officer"* before *any* suspension or expulsion, including the following:

a) Notice of specific charges;

b) Notice of the "nature of the evidence";

c) Opportunity to present a defense;

d) Opportunity to "confront witnesses against the student";

e) Right to have legal counsel;

f) Notice of right of appeal;

g) Notice of the decision to suspend or expel;

h) Notice of right to return within fifteen (15) days or a suspension for the semester.

6) Damages of $10 per day for each day the three plaintiffs were out of school.

7) To provide special classes to permit plaintiffs to make up for the schooling lost.

8) Court to retain jurisdiction until satisfied no further wrongful administrative acts "exist and will not recur."

The answer of defendants has denied all of the above allegations by the plaintiffs. In their answer the defendants

have affirmatively alleged the following:

44) Plaintiff Geraldine Graham at no time has been suspended or expelled from the public schools of the School District of Omaha, or in any way denied by defendants of the right to a public education. Plaintiff Geraldine Graham was temporarily suspended from classes at North High School and offered placement at other schools within the School District of Omaha, none of which has been accepted.

45) Following the altercation at North High School on March 29, 1972, plaintiff Geraldine Graham has been afforded the opportunity to participate with her mother, plaintiff Cora Graham, and their legal counsel, in numerous meetings and conferences with administrators at North High School, and with defendant Hlavac, and his assistants, prior to and at which, plaintiffs have been fully advised as to the reasons for suspension of Geraldine Graham from North High School and her reassignment, and have had adequate opportunity to respond to the factual bases relied upon by the defendants in their decision to reassign plaintiff to a school other than North High School. The procedures so followed with respect to plaintiff Geraldine Graham comply with any due process of law which may have been required in the actions so taken in regard to Geraldine Graham.

46) Plaintiff Louis Pratt was at no time suspended or expelled from the public schools of the School District of Omaha, or in any way denied by defendants of his right to a public education. Plaintiff Louis Pratt was temporarily suspended from classes at Horace Mann Junior High School pending reassignment to a school within the School District of Omaha which could more adequately deal with the learning and disciplinary problems peculiar to him.

47) Plaintiff Louis Pratt and his mother, plaintiff Mattie Pratt, were adequately informed of the reasons for his suspension from classes at Horace Mann Junior High School, and thereafter plaintiff Louis Pratt, plaintiff Mattie Pratt, and their legal counsel were afforded the opportunity to attend a conference with defendant Barbee, his Assistant Principal, and the teacher of Louis Pratt, at which conference the reasons for the suspension from Horace Mann Junior High School and reassignment were fully disclosed, and plaintiffs Louis Pratt and Mattie Pratt and their counsel were given the opportunity to rebut the factual bases for the decision to reassign plaintiff Louis Pratt to another school. The procedures so followed with respect to plaintiff Louis Pratt complied with any due process of law which may have been required in the actions so taken in regard to plaintiff Louis Pratt.

48) Plaintiff George Cooperrider was at no time suspended or expelled from the Omaha Public Schools, or in any way denied by defendants of the right to a public education. Plaintiff George Cooperrider and his mother, Elizabeth Cooperrider, were adequately informed as to the reasons for plaintiff George Cooperrider's suspension from classes at Indian Hill School, by letter of defendant Ida Gitlin dated February 25, 1972, which was transmitted to plaintiff Elizabeth Cooperrider on said date, and at all times material herein, plaintiff George Cooperrider has had the opportunity to return to classes at Indian Hill School on the condition that he and his mother, plaintiff Elizabeth Cooperrider, participate in a conference with defendant Ida Gitlin. Plaintiffs George and Elizabeth Cooperrider have at all times material herein failed or refused to participate in such a conference. Plaintiff Elizabeth Cooperrider, to the date of this Answer, has failed to contact defendant Ida Gitlin as required by said letter of February 25, 1972. The only contacts, made between plaintiffs George Cooperrider and Elizabeth Cooperrider and

the School District of Omaha, or any representative thereof, concerning the school placement or re-entry of George Cooperrider in Indian Hill School since February 25, 1972, have been contacts instituted by the defendant Ida Gitlin and another representative of the School District of Omaha. Plaintiffs Elizabeth Cooperrider and George Cooperrider have made no request or demand prior to the filing of the Complaint in this action, that plaintiff George Cooperrider be readmitted to Indian Hill School. Defendants' procedures with respect to plaintiff George Cooperrider have complied with any due process of law which may have been required in the action so taken in regard to plaintiff George Cooperrider.

## PROCEDURES IN USE WITHIN THE SCHOOL DISTRICT OF OMAHA

The evidence adduced showed the following philosophy of the Administration of the School District of Omaha with respect to student disciplinary cases. The approach of the School District appears to be one of counseling, rather than punishment. Apparently the first consideration is the educational welfare of the child and, secondly, the educational welfare of other children with whom that child is commingled. As stated, the purpose seems to be:

"Primarily to work with the child and his parents in making personal and educational decisions, really, that are in the best interests of that particular child."

The administrators initially responsible for disciplinary matters are the principals in the elementary schools and the principal and assistant principals in the junior high schools and high schools. The procedure with respect to suspensions consists of a conference between the principal and the student, followed by a telephone call to the home, all before the student is sent home from school. Following this parental conference, ordinarily the student is readmitted to the school. If the parent refuses to participate in a parental conference, the principal sometimes holds a conference with the student alone, and reinstates him at that point. Failing this, the principal or administrator may refer the matter to the office of defendant Hlavac, Superintendent of pupil personnel services. Ordinarily, the matter is resolved by the joint conference of parent, student and principal. Ordinarily, reinstatement follows this joint effort.

If, after a parental conference, the parents are dissatisfied with the disposition made by the principal or administrator, they are given the right to appeal to Doctor Hlavac's office.

The principal or administrator may suspend a student and refer him directly to the Superintendent's office, in which case a letter is immediately sent to the parent notifying him of the action taken, with a copy of the letter sent to the Superintendent's office. The copy of the letter may then be referred by the superintendent to the Community Counselor* having jurisdiction over the particular school. Generally, the parent contacts first the school principal, and if the hearing there is unsatisfactory, he may be heard at the superintendent's office. If no contact is made within a short time, the Community Counselor ordinarily is instructed to make the contact with the parent. An appointment is thereafter scheduled for a conference with the child and the parent.

The Community Counselor may act as an additional investigator and fact finder if the facts are in dispute and, in addition, gathers all information pertinent to the problems of the child. Recommendations for placement are then made by the Community Counselor either in the school from which the student was referred, or to other schools.

---

* "Community counselor" is the new term for "visiting teacher" as used in Section 3.28e of the Policies and Regulations of the Omaha School District (p. 5 above).

The Community Counselor then determines whether such placement can be arranged, if it is agreed upon by the parent. If the parent is dissatisfied with the disposition recommended by the Community Counselor, he is advised of the right to a conference with the superintendent. If, after conferences with the superintendent, there has been a failure to reach agreement as to placement or disposition, the parent is advised of the grievance procedures of the School District of Omaha, and the right to appeal to the Board of Education. At all stages of the disciplinary hearing procedures, a student is entitled to be accompanied by his parent and legal counsel. Cross-examination of administrative staff members is permitted, but cross-examination of students is not permitted.

The procedures summarized above are the practice and procedures followed in suspension cases, but not set forth in printed form. However, these procedures are said to be orally communicated to all administrators at the beginning of each school year.

It is apparent that the above procedures are designed to involve, immediately, the school and parent, along with the recalcitrant student, in a community of interest to resolve the disciplinary problem so the errant student may be returned to class with encouragement from the home environment. This appears to be successful in nearly all cases. A "low key" involvement of these two parties is the thrust of the system.

### ISSUES

The issues before the Court for decision are three-fold:

1) What type of notice and what type of hearing are required by due process of law before a student is suspended from attendance at school?

2) Are Sections 6.7a and 3.28e of the Policies and Regulations of the School District of Omaha, which cover the exclusion of pupils from school and the duties of the principal, unconstitutional for failure to require that a school principal or other school administrator give a student notice and an opportunity to be heard regarding the charges against him? and

3) Are the procedures as written and orally supplemented, described above, sufficient due process to protect the rights of children removed from school?

Of importance is the evidence in this case. The evidence is well documented. The facts determine whether these are comparatively isolated dissident school patrons or are typical of misconduct by the school authorities which would violate the constitutional right of students. If these are three instances of misconduct on the part of the students giving rise to their removal from the school scene, and are merited disciplinary procedures, then the complaint should fail. If the facts show the failure of the schools in treatment of the rights of the plaintiffs, then the cause is cognizable here.

The issue is one of due process procedurally, as opposed to the correctness in these suspensions or expulsions, if based on an exercise of responsible judgment by the defendants.

### EVIDENCE AND FINDINGS CONCERNING GERALDINE GRAHAM

#### TESTIMONY OF MRS. GRAHAM

On March 29, 1972, Geraldine Graham, a ninth-grade student at Omaha North High School, was suspended by principal Harold Reeves. Mrs. Cora Graham stated that Mr. Reeves informed her by phone on March 30, 1972, that the daughter had been suspended for involvement in a fight and that she would remain suspended for a period of three days to allow the administration to investigate and decide whether referral to a community counselor would be necessary. Mrs. Graham stated that on April 5, 1972, she received a letter dated April 4, 1972, from Mr. Reeves saying her daughter had been suspended from North High and that her problem had been referred to the Board of Education. Mrs. Gra-

ham said the letter did not state the reason for the suspension.

The letter from Mr. Reeves instructed Mrs. Graham to contact Doctor Rene Hlavac if she wished for her daughter to continue her education. Mrs. Graham called Doctor Hlavac as directed and was referred to Miss Beverly Morgan, a community counselor in the Omaha Public Schools with jurisdiction over suspensions from North High. Mrs. Graham stated that on or about April 13, 1972, she was advised by Miss Morgan that Miss Morgan was attempting to place the daughter in another school. On April 14, 1972, Mrs. Graham was notified by Miss Morgan that her daughter could immediately attend Lewis and Clark Junior High School. Mrs. Graham opposed her daughter's transfer to another school because she felt that her daughter stood a better chance of successfully completing the school year at North High than in a new school where she would have to adjust to a new environment.

On April 19, 1972, a conference was held between student Geraldine Graham, her mother, Cora Graham, Mrs. Graham's attorney, Robert V. Broom, a Mr. Jack West, an interested friend of the Grahams, and Doctor Rene Hlavac, assistant superintendent for pupil personnel services of the Omaha Public Schools, and Miss Morgan, community counselor. The factual background behind a decision of the North High administration to oppose the readmission of Geraldine Graham to North was discussed. Mrs. Graham was again offered an opportunity to enroll her daughter at Lewis and Clark Junior High, at which time the reasons for Geraldine's suspension by Mr. Reeves were discussed as well as the background of previous disciplinary problems that she had experienced at North High.

On May 5, 1972, Mrs. Graham requested a conference with assistant superintendent Hlavac which was held on May 8, 1972. Mrs. Graham stated that it was at this conference between herself, Geraldine, attorney Broom, Jack West and Doctor Hlavac, together with Miss Morgan, that she was first informed that her daughter was accused of having wielded or used a cake cutter in the March 29, 1972, disturbance. However, on cross-examination, she also stated that her daughter's possession of a cake cutter was discussed with Mr. Davis on April 25, 1972. Mrs. Graham stated that Geraldine has at all times in the presence of Hlavac and other school officials denied that she was in possession of a cake cutter.

Mrs. Graham testified that she had not been told specific reasons why her daughter was suspended. However, she also stated that it had been explained to her that her daughter had been suspended because of her involvement in a fight and that the suspension was for Geraldine's best interests. In this regard, Doctor Hlavac told Mrs. Graham he was concerned about the reaction of certain white students to her return to North High. Mrs. Graham stated that her daughter has at all times denied any more involvement than any other student in the fighting. She stated that her daughter had requested to confront her accusers but has not been allowed to do so, nor to have an informal meeting with those stating she had slashed and stabbed a girl. The incident had occurred in a general melee involving white and black girl students in the study hall during school hours.

## DEFENSE TESTIMONY

Witnesses for the defendants in the matter of the suspension of Geraldine Graham from North High School were Mr. Harold Reeves, principal of Omaha North High, Mr. Marvin C. Decker, administrative assistant at North High, Mr. Dick C. E. Davis, vice principal at North High, Miss Beverly Morgan, a community counselor for the Omaha Public Schools having jurisdiction over suspensions from North High, and Doctor Rene Hlavac, assistant superintendent for pupil-personnel services of the Omaha Public Schools.

Mr. Harold Reeves, principal of North High, testified to a history of previous

disciplinary problems with Geraldine Graham, starting upon her arrival at North High in September, 1971. His records contained the following entries:

1) On September 18, 1971, a note was sent to Mrs. Graham because of skipping school by Geraldine;

2) On September 30, 1971, conference was held between Geraldine and Mr. Decker because of Geraldine's lateness to school and class;

3) On October 14, 1971, Geraldine was involved in a fight with another girl but school records indicate no conference was held or that a suspension followed;

4) On November 9, 1971, Geraldine was given a warning for skipping the ninth hour;

5) On November 17, 1971, conference was held between Geraldine, Mrs. Graham and Mr. Davis, at which time the general discussion concerned Geraldine's skipping school and being late to classes;

6) On January 12, 1972, Geraldine was suspended for a fight with another student but was exonerated and readmitted on January 17, 1972;

7) On February 15, 1972, Mr. Davis investigated an incident in which Geraldine stated that she had received the permission of the school nurse to leave school and was not just avoiding attendance.

Mr. Reeves said school records indicated that the next disciplinary incident involving Geraldine was the fight on March 29, 1972, in 060 study hall. An investigation was conducted by North administrators, who interrogated the students involved. The results of this investigation were transmitted to Mr. Reeves. The investigation showed that a fight had broken out between Geraldine Graham, who was black, and a white student named Diane Sillik, and that immediately twelve or thirteen other girls became involved. Battle lines in the fight were drawn along racial lines with whites and blacks pitted against one another. After the fight, Miss Graham was interrogated by Mr. Decker, administrative assistant at North, who took her statement in the presence of her mother. Diane Sillik, who had been injured in the fighting, told Mr. Reeves the injuries to her face and back were the result of her having been struck by Geraldine Graham with a cake cutter. Both Geraldine Graham and Diane Sillik were suspended from school and sent home.

Mr. Reeves conceded that he did not, before suspending Geraldine, give her an opportunity to rebut the facts against her or to confront the witnesses against her.

Following the conclusion of his investigation, Reeves sent a letter to Mrs. Graham on April 4, 1972, informing her that her daughter had been suspended from North and that her problem had been referred to the superintendent of schools. Mr. Reeves stated that the purpose of referring Geraldine Graham to Hlavac, the assistant superintendent of schools, was to provide for her placement in a school other than North High. In addition to his letter, Mr. Reeves contacted Mrs. Graham by phone on April 6, 1972, and informed her that he had investigated the incident and felt that her daughter should not return to North High for the good of the school. Mr. Reeves said that the fear of possible additional violence of a racial nature weighed heavily in his decision that neither Geraldine Graham nor Diane Sillik should be readmitted to North High.

### TESTIMONY OF MR. DECKER

Mr. Marvin Decker, administrative assistant at North High, testified that a disturbance was reported to him in 060 study hall the morning of March 29, 1972. Mr. Decker stated that as he entered the room, another North teacher, a Mr. O'Neill, was moving a young lady out of the study hall. Mr. O'Neill stated to Mr. Decker that this young lady was "one of the parties involved in the fighting." Approximately twenty minutes later, Mr. Decker took a statement from Geraldine Graham in the presence

of her mother. After he had finished taking Geraldine's statement, Mr. Decker read his investigative notes to Geraldine and Mrs. Graham, and they indicated they had no additions or corrections to make. Mr. Decker testified that he believes that the policies and regulations of the School District of Omaha promulgated by the Omaha School Board and the statutes of the State of Nebraska regarding suspensions and expulsions are the only written guides available to administrators in deciding whether or not to suspend the student.

## TESTIMONY OF DICK C. E. DAVIS

Mr. Dick C. E. Davis, an administrative intern and vice principal at North High testified that as he arrived at 060 study hall, he observed Geraldine Graham walk out of the study hall waving a cake cutter. Mr. Davis subsequently conducted an investigation into the disorder. The result of his investigation identified Geraldine Graham and Diane Sillik as the principals in the altercation. Mr. Davis was subsequently involved in a conference with Mr. Reeves, Mr. Decker, and Mr. Trumbauer, assistant principal of North High, at which time they unanimously agreed to suspend Geraldine Graham and Diane Sillik and refer the matter to the Board of Education for resolution of the problem at that level. Both at this time and later at an April 25, 1972, conference with Geraldine, Mrs. Graham, Mrs. Graham's attorney, Broom, and Mr. Jack West, Mr. Davis stated that he felt neither Geraldine's best educational interests nor those of the other students at North High would be served by her return to North High. He also stated that there was at least a probability that additional violence might result if either girl were readmitted to North High.

Mr. Davis stated his opinion that the disturbance involving Geraldine occurred in a tense atmosphere with polarization between black and white students at North High. This tension persisted for three or four days beyond the incident itself. He described this three or four day period of polarization between blacks and whites as the most difficult crisis that North High had experienced in the last two years, although there had been some racial incidents in the past. He expressed his opinion that readmission of either Geraldine Graham or Diane Sillik would be damaging to the interests of North High School, as well as to the interests of the girls themselves. He stated neither student could be expected to develop their educational potential in a racially tense atmosphere.

## TESTIMONY OF MISS MORGAN

On April 7, 1972, Mrs. Graham and Miss Beverly Morgan, a community counselor for the Omaha Public Schools, with jurisdiction over suspensions from North High, made arrangements for a conference to be held on April 10, 1972, to discuss the suspension of Geraldine Graham. At this time, Miss Morgan afforded Geraldine an opportunity to tell her version of the facts. In Miss Morgan's opinion, Geraldine's statement was substantially the same as the one she had given Mr. Decker. At the close of the conference, Miss Morgan informed Mrs. Graham that the North High administration did not want Geraldine returned to North. Miss Morgan informed Mrs. Graham that if she chose to seek her daughter's return to North, she had a right to appeal to Doctor Hlavac.

Accordingly, on April 19, 1972, a conference was held between Geraldine, Cora Graham, Mrs. Graham's attorney, Broom, Jack West, Doctor Hlavac and Miss Morgan, concerning a suitable placement for Geraldine in addition to a general discussion of the March 29, 1972, fight. Miss Morgan stated that in her opinion, Mrs. Graham and Mr. Broom were given the opportunity to question assistant superintendent Hlavac and herself as to the facts which their investigations had disclosed. At the end of the discussion, Hlavac stated that he would uphold the request of principal Reeves that he not return Geraldine Graham to North High. However, in response to a request by Geraldine, Miss Morgan was directed by Doctor Hlavac to go to North High and interview a student

whom Geraldine indicated had been involved as a messenger between the opposing groups shortly before the fight began. Miss Morgan interviewed the student designated by Geraldine. The student stated that she had seen Geraldine strike Diane Sillik with a cake cutter.

At an April 21, 1972, meeting at Horace Mann Junior High, Miss Morgan stated that she heard Hlavac offer attorney Broom placement for Geraldine at Lewis and Clark Junior High School. This offer of placement at Lewis and Clark, or whatever other Junior High Mrs. Graham felt would be acceptable to her from a transportation standpoint, was again made Mrs. Graham on May 5, 1972, by Miss Morgan, but was refused by Mr. Broom as her attorney. Mr. Broom requested a May 8, 1972, conference with Doctor Hlavac. At this time, the fight in which Geraldine had been involved was again discussed, as well as the different viewpoints as to the appropriate placement for Geraldine. Hlavac agreed to a request made by Mr. Broom that the girls who had been witnesses to the fighting between Geraldine Graham and Diane Sillik be interviewed. The interviews were conducted with each girl by Miss Morgan on May 9, 1972, and May 10, 1972. Miss Morgan stated that the facts which her interviews disclosed did not vary from the facts which had been previously reported to her by the North High school administration. At Hlavac's request, Miss Morgan notified Mr. Broom by phone on May 10, 1972, that Hlavac's decision to honor request of North High administration that Geraldine be placed elsewhere than at North High remained unchanged. This decision was confirmed in a letter which followed the next day.

Miss Morgan stated that in her professional opinion, it would not be in the best interests of Geraldine Graham, nor in the best interests of the other students at North High, to have Geraldine returned to North High "for the remainder of the semester." This statement was made on June 9, 1972, at a time when the semester referred to by Miss Morgan had just ended. Miss Morgan stated that the written guidelines used by her in her decision-making process in dealing with suspensions and expulsions are found in Section 6.7a of the policies and regulations of the Omaha Public School System. In response to questioning by the Court, Miss Morgan stated that she had no knowledge of any communication in writing prior to May 11, 1972, from the Omaha Public Schools to Mrs. Graham, stating that her daughter would not be readmitted to North High, but would be placed in any other school that Mrs. Graham desired.

## TESTIMONY OF RENE HLAVAC

Doctor Rene Hlavac, assistant superintendent for pupil-personnel services of the Omaha Public Schools, testified that on April 19, 1972, he made known his tentative decision to uphold the recommendation of the North High Administration that Geraldine Graham not be returned to North. Hlavac testified that Geraldine's possible possession of a cake cutter during the fight did not affect his decision not to place her at North High. He said the factors he gave primary consideration to in recommending placement at a school other than North were: First, that Geraldine was not working up to her ability; and second: that he felt there was a definite possibility that Geraldine's chances of obtaining a quality education might be jeopardized by unfavorable peer reaction to her participation in the March 29, 1972, fight. In response to a request by Geraldine, Hlavac stated that he directed Miss Morgan to interview a student whom Geraldine had stated had been involved in the fight as a message carrier. Doctor Hlavac testified that the facts communicated to him as a result of Miss Morgan's interview of the student named by Geraldine disclosed no variance of the facts found by the North High administration, and in fact, confirmed Geraldine's possession of a cake cutter.

In response to a request by Mr. Broom, conference was held on May 8, 1972, be-

tween Geraldine, Mrs. Graham, Mr. Broom, Doctor Hlavac and Miss Morgan, at which time the request of Mrs. Graham and Mr. Broom that Geraldine be returned to North High was again discussed. Doctor Hlavac again refused this request and indicated that facts found by him indicated the soundness of the decision to place Geraldine at a school other than North High. However, in response to a request by Mr. Broom, Hlavac directed Miss Morgan to interview several of the other girls who had witnessed the fighting. The interviews were conducted, and they confirmed that the main participants in the fighting had been Geraldine Graham and Diane Sillik. On May 10, 1972, Hlavac directed Miss Morgan to phone Mr. Broom and inform him that Geraldine would not be returned to North High but that placement was still available to her in any other junior high desired by Mrs. Graham. This decision was confirmed in a letter to Mr. Broom dated May 11, 1972.

It was noted that the Sillik girl was not reinstated in North High.

## FINDINGS OF FACT REGARDING SUSPENSION OF GERALDINE GRAHAM

Having heard the witnesses, this Court concludes the actual facts triggering the suspension of Geraldine Graham are as stated by the officials of North High School. The Court finds that Mr. Reeves reached his April 4, 1972, decision upon the basis of facts contained in reports of the incident made to him by North High administrators, which had identified Geraldine Graham and Diane Sillik as the main participants in the fighting, a written statement made by Geraldine Graham in the presence of her mother, as well as a statement made to him by Diane Sillik that she stated it was Geraldine who had struck her with a cake cutter. The Court finds the decision of the North High School administration to have been based upon its unanimous belief that the best interests of Geraldine Graham, Diane Sillik, and North High's two thousand other

students demanded that *neither* girl be returned or placed at North High. ·

However, Mr. Reeves did not personally give Geraldine Graham an opportunity to explain her version of the facts nor to rebut statements made by other students attributing to her the role of the main participant in the altercation, but relied on such reports of his administrative subordinates who *did* personally confront student Geraldine Graham.

The Court further finds that on April 10, 1972, Mrs. Graham was informed that the administration at North High did not want her daughter returned to North High and why. She was also informed that she could talk to the assistant superintendent Hlavac and state why she desired her daughter returned to North High. After an April 19, 1972, conference with Geraldine, Mrs. Graham, Mrs. Graham's attorney, Broom, and Jack West, Doctor Hlavac stated that it was his decision to uphold the recommendation of North High administrators and offered Mrs. Graham placement for her daughter in another school. However, Doctor Hlavac did direct that a student named by Geraldine Graham be interviewed by Miss Morgan. This interview confirmed Geraldine's possession of a cake cutter and her status as a main participant in the fight.

The Court finds that on May 10, 1972, Mr. Broom was notified in a phone call from Miss Morgan that in view of the fact that the interviews had disclosed no new information, Hlavac would not return Geraldine Graham to North High School. Mrs. Graham was also told by Miss Morgan that placement was still available at Lewis and Clark Junior High, or at any other junior high of Mrs. Graham's choice. The Court concludes that this decision was confirmed in a letter to Mr. Broom which followed the next day. The Court finds that a subsequent offer of placement in the Individual Life Study Center, or in summer school at North High, has been available to Mrs. Graham for her daughter at all times during these hearings.

The Court finds that notice of the reasons for suspension, the options for further education in Omaha schools, and extensive fact finding were done concerning Geraldine's case. The Court notes, however, that Mother Graham and her counsel seem adamant on her return to North High, regardless of the educational environment surrounding Geraldine there.

## EVIDENCE AND FINDINGS OF FACT CONCERNING GEORGE COOPERRIDER

At noon on February 25, 1972, eleven-year old George Cooperrider, a former psychiatric patient, was sent home from Indian Hills Elementary School by its principal, Miss Ida Gitlin. George bore a note to his mother saying that because of his disruptive behavior he was to stay home "until further notice." The note asked Mrs. Cooperrider to let Miss Gitlin know how she could be contacted by phone. The reasons given her in Miss Gitlin's note for George's suspension were his involvement in a quarrel at breakfast time, and his striking a child who had hit a younger Cooperrider youth.

According to Mrs. Cooperrider's testimony, she sent Miss Gitlin a note which asked Miss Gitlin to call her at her neighbors, since the Cooperrider family did not have a telephone. Mrs. Cooperrider said that Miss Gitlin called her at her neighbors when she was not available and said she would be "in touch with" Mrs. Cooperrider. Mrs. Cooperrider also stated that she called Miss Gitlin after the February 25, 1972, note from Miss Gitlin, and at that time, Miss Gitlin emphasized her belief that George was in need of further psychiatric care. The witness did not testify as to the respective dates of these conversations between herself and Miss Gitlin. No further conversations regarding George were had between Mrs. Cooperrider and Miss Gitlin until May 11, 1972, when George's possible need for psychiatric care was again discussed.

Mrs. Cooperrider stated that after the note from Miss Gitlin, she had no further contact with any school official until the last part of March, 1972, when Mr. Robert G. Hahn, a community counselor for the Omaha Public Schools, contacted her regarding George's absence from school. Mrs. Cooperrider said Mr. Hahn told her he would see what he could do about getting George back into Indian Hills Elementary or transfer him to another school. Mrs. Cooperrider stated that Mr. Hahn told her he would "get back to me" but she had heard nothing further from him. However, in her May 11, 1972, discussion with Miss Gitlin, Mrs. Cooperrider referred to her meeting with Mr. Hahn and stated that he had "more or less taken over" efforts on George's behalf.

The witness testified that she had received no "further notice" in regard to George's being sent home. She stated that she had not been given an opportunity to hear the charges made against George nor to present evidence in her son's behalf "only what little bit I talked to the principal."

Under questioning by defense counsel, Mrs. Cooperrider confirmed that George had been hospitalized for psychiatric testing in the latter part of January and the early part of February, 1972. She denied that she received any reports as to the results of the testing done. She further revealed that there had been previous psychological testing performed on George in response to a November 18, 1971, letter from Miss Gitlin suspending George from school. Mrs. Cooperrider stated that, although George's doctor had cleared his return to school on February 18, 1972, he thought it would be better for George to be out of Indian Hills Elementary altogether.

## EVIDENCE OF DEFENDANTS CONCERNING GEORGE COOPERRIDER

Witness on behalf of the defendants regarding the suspension of George Cooperrider from Indian Hills Elemen-

tary School were Miss Ida Gitlin, principal of Indian Hills, Mr. Robert G. Hahn, a community counselor for the Omaha Public School System, and Doctor Rene Hlavac, assistant superintendent, pupil-personnel services for the Omaha Public Schools.

Miss Ida Gitlin, principal of Indian Hills Elementary School, testified that she had experienced "severe disciplinary problems" with George Cooperrider before his latest suspension on February 25, 1972. Her records disclosed that on November 18, 1971, a note from Miss Gitlin to Mrs. Cooperrider informed the latter that George had been suspended. The reason cited for George's suspension was that George bit a child. George was immediately sent home but returned to his classroom with what Miss Gitlin described as a "big chain" and told the class that he was ready for anyone who wanted to start something. Miss Gitlin stated that school records also indicated that on January 18, 1972, George was involved in a fight on the playground. Miss Gitlin conducted an investigation into the circumstances surrounding the fight before George was sent home.

Miss Gitlin's official school records contain no entry that word was ever sent her by Mrs. Cooperrider regarding George's hospitalization for psychological testing in the latter half of January and the early part of February, 1972. She learned of George's hospitalization from a request received by the school from the testing agency for information regarding George. A psychological evaluation received by the school recommended that George should attend only half a day in order to ease him back into the routine of school. The fact that this return was on a trial basis was communicated to Mrs. Cooperrider by a letter from Miss Gitlin. On February 18, 1972, Miss Gitlin returned George to school on a trial basis.

On February 25, 1972, less than a week after his return, George Cooperrider was again sent home from Indian Hills Elementary School by Miss Gitlin. His mother was instructed in a note to keep

him there "until further notice." Miss Gitlin's note stated that the reasons for George's being sent home were that he had verbally abused a breakfast aide, verbally abused other children, and that he had hit a child for no reason at all. Although she usually gives the student a chance to explain his conduct, on this last occasion, Miss Gitlin gave George no chance to explain his actions before sending him home. She stated that she based her decision to suspend George on the reports of her subordinates.

Miss Gitlin stated that she received no response from Mrs. Cooperrider to her note asking that George be kept home "until further notice" and asking Mrs. Cooperrider to let Miss Gitlin know how she could be contacted by phone. Because of this, Miss Gitlin stated she assumed that Mrs. Cooperrider was having George cared for psychiatrically. Miss Gitlin said there was no further contact between her and Mrs. Cooperrider concerning George's suspension until May 11, 1972, when Mrs. Cooperrider came to school to discuss the problems of another Cooperrider child. At this time, Mrs. Cooperrider stated to Miss Gitlin that Mr. Hahn was "trying to find a placement" for George.

Miss Gitlin testified that there has been no time since sending George home that she would not have taken him back if only she had been contacted by Mrs. Cooperrider in an effort to seek a resolution of George's behavior problems. Questioning of Miss Gitlin by the Court elicited that during the 1971–72 school year, prior to February 25, 1972, there had been seven letters to Mrs. Cooperrider concerning the problems the school was having with George, and that six conferences had been held with Mrs. Cooperrider by the school.

TESTIMONY OF MR. ROBERT G. HAHN

Mr. Robert G. Hahn, a community counselor in the Omaha Public School System, with jurisdiction over suspensions from Indian Hills Elementary, testified that he had previous contact with

Mrs. Elizabeth Cooperrider on November 18, 1971, November 30, 1971, January 19, 1972, and February 3, 1972, regarding disciplinary problems with her son, George. Mr. Hahn stated that on April 5, 1972, he received a call from Miss Gitlin asking him to see if he could find out the reason for George's continued absence from school. This was the first notice Mr. Hahn had that George had been absent from school since February 25, 1972.

Mr. Hahn contacted Mrs. Cooperrider that same day and was informed by her that she was trying to get George into Boys' Town. She told Hahn that her caseworker was making efforts on her behalf in this regard. Hahn stated that he told Mrs. Cooperrider that Miss Gitlin would take George back, and that if she wanted George returned to Indian Hills, she should contact Miss Gitlin. Hahn stated that he has made no further efforts to return George Cooperrider to school thereafter.

### TESTIMONY OF DOCTOR RENE HLAVAC

Rene Hlavac, assistant superintendent for pupil-personnel services for the Omaha Public Schools, testified that George Cooperrider would have been re-admitted to Indian Hills, or that another placement would have been available to him if his mother had contacted Miss Gitlin. He stated that since the suspension of George Cooperrider, there had been no request by either Mrs. Cooperrider or her attorney, Robert V. Broom, for a meeting with him to review or discuss George's suspension at Indian Hills.

### FINDINGS OF FACT

The Court finds that George Cooperrider was sent home from Indian Hills Elementary School on February 25, 1972, for reprehensible conduct, but without his having been given a chance to dispute the facts regarding his conduct that day. However, Principal Gitlin's note informed Mrs. Cooperrider of the factual basis for George's being sent home and asked that he be kept home "until further notice." It is undisputed that Miss Gitlin did not personally observe the incident of alleged misconduct by George Cooperrider, but instead relied upon the facts reported to her by her subordinates.

The Court finds that no communication concerning George's suspension was had between Miss Gitlin and Mrs. Cooperrider from February 25, 1972, until May 11, 1972. The Court also finds that Mrs. Cooperrider did not call at the school for a conference during that period.

Miss Gitlin, in contact with community counselor Hahn, understood early in April, 1972, that efforts were being made to place George in Boys' Town, and until May 11, 1972, no such contrary information was given the principal.

The Court finds that Miss Gitlin was at all times willing to re-admit George Cooperrider to Indian Hills Elementary after talking with Mrs. Cooperrider. After speaking with Mr. Hahn on April 5, 1972, Mrs. Cooperrider knew that, if she wanted George re-admitted to Indian Hills, she only had to contact Miss Gitlin. Miss Gitlin assumed that, since she had not heard from Mrs. Cooperrider, Mrs. Cooperrider was seeking the resolution to George's behavior problems elsewhere.

The Court concludes that, if Mrs. Cooperrider wished George returned to Indian Hills Elementary, the burden was upon her to have so indicated to Miss Gitlin.

### EVIDENCE AND FINDINGS OF FACT CONCERNING LOUIS PRATT

### TESTIMONY OF MRS. MATTIE PRATT

On March 29, 1972, Mrs. Mattie Pratt received a letter from the principal of Horace Mann Junior High School, Clarence Barbee, notifying her that her son, Louis Pratt, had been suspended from Horace Mann because of "poor behavior, conduct and attitude." The letter stated that Mrs. Pratt was not to return her son to Horace Mann until she had a

conference regarding his problems with Mr. James Clinton, a community counselor in the Omaha Public School System, who had jurisdiction over suspensions from Horace Mann Junior High.

Mrs. Pratt claimed that she was not presented an opportunity to talk with Mr. Barbee regarding the reasons for her son's suspension until an April 12, 1972, conference. Mrs. Pratt was informed by Mr. Barbee that he did not want her son returned to Horace Mann. Mr. Barbee indicated that the matter of whether or not Louis would be placed at Horace Mann was "out of his hands," and would be decided by Mr. Clinton. Mrs. Pratt said on May 24, 1972, that she wanted her son returned to school and stated her desire that he be returned to Horace Mann since the school year was rapidly drawing to a close.

Cross-examination of Mrs. Pratt by defendants' counsel revealed that her son had been suspended four times since September, 1971, when the school year began. Mrs. Pratt cited the reasons given to her for the suspensions as "conduct, attitude, and behavior, and one incident when he hit this boy." According to Mrs. Pratt, each suspension was followed by a conference with a community counselor. Louis attended each conference concerning him, and after each conference was placed or returned to Horace Mann. Mrs. Pratt stated that her son's teachers had never been present nor had she been allowed to cross-examine her son's accusers at conferences held after Louis' previous suspensions. However, she indicated that Principal Barbee met with her on those occasions.

On April 12, 1972, a conference was held between Louis, Mrs. Pratt, Mrs. Pratt's attorney, Robert V. Broom, Mr. Clinton, Mr. Barbee, Mr. Correy, assistant principal at Horace Mann, Mr. Harvey, a Horace Mann teacher, and Miss Ferber, the home room teacher whose March 29, 1972, referral of Louis to Mr. Barbee for disciplinary problems in her class, ultimately resulted in his suspension. The discussion concerned the facts cited by Miss Ferber in her referral of Louis as well as past disciplinary problems which the school had experienced with Louis. In Mrs. Pratt's own words, "The discussion got wild for quite a while. It was just about everything."

However, it was agreed that an attempt was to be made to place young Mr. Pratt in the Individual Life Study Center (hereinafter known as the I.L. S.C.). Mrs. Pratt stated that it was not until May 9, 1972, that she was informed by letter that psychological testing on Louis had determined that neither Horace Mann nor the I.L.S.C. would meet her son's needs and that a placement would have to be made elsewhere to accomplish this goal. Mrs. Pratt testified that she received notice on May 23, 1972, that placement was available for Louis in a special education class which would meet his needs.

## TESTIMONY OF WITNESSES FOR THE DEFENDANTS

Witnesses on behalf of the defendants in regard to the suspension of Louis Pratt from Horace Mann Junior High were Clarence Barbee, principal of Horace Mann, Mr. James Clinton, a community counselor for the Omaha Public Schools, and Rene Hlavac, assistant superintendent for pupil personnel services of the Omaha Public Schools.

## TESTIMONY OF CLARENCE BARBEE

Mr. Barbee testified that his official school records contained the following entries regarding previous disciplinary problems with Louis Pratt:

1) Teacher who had referred Louis to Mr. Barbee for fighting was present at an October 1, 1970, parental conference between Mr. Barbee and Mrs. Pratt;

2) On March 23, 1971, parental conference was held between Mr. Barbee and Mrs. Pratt regarding Louis' suspension for stealing another student's electricity project. The teacher who accused Louis of this misconduct was present at the conference;

3) Following Louis' May 17, 1971, absence from school, a parental conference was held to discuss Louis' explanation of his absence from school;

4) On September 24, 1971, Mr. Barbee suspended Louis for truancy, but Louis was readmitted after a conference between his mother and Mr. Barbee;

5) Louis was suspended on October 11, 1971, for truancy but was readmitted following a conference between Mrs. Pratt and Mr. Clinton;

6) On November 4, 1971, Louis was suspended for fighting. A conference was held on November 12, 1971, after which Louis was readmitted to Horace Mann;

7) Louis was suspended on January 20, 1972, by Mr. Barbee for refusing to do assigned class work but was readmitted to Horace Mann due to the recommendation of Mr. Clinton;

8) On March 29, 1972, Louis was suspended by Mr. Barbee after a referral from Louis' home room teacher, Miss Ferber, on account of Louis' misbehavior.

Mr. Barbee stated that at the April 12, 1972, conference, both Mrs. Pratt and Mr. Broom questioned Miss Ferber and himself regarding the facts relied upon by them in the referral and suspension of Louis Pratt from Horace Mann Junior High. Miss Ferber was questioned in regard to her referral of Louis to Mr. Barbee and in regard to a write-up on Louis' problems which she had prepared on April 11, 1972. Mr. Barbee was questioned as to whether he would readmit Louis Pratt to Horace Mann, and he replied that he would not. Mr. Barbee testified that if the April 12, 1972 conference had brought out that Louis had not been guilty of the disruptive conduct attributed to him, he would have been immediately reinstated. Mr. Barbee testified that it was his understanding that the question of where Louis was to be placed rested with Mr. Clinton at all times after April 12, 1972.

Mr. Barbee stated that as a matter of course he reviews the entire record of a particular student in determining whether to oppose a suspended student's reinstatement at Horace Mann. He stressed the relevancy he attached to the record of Louis Pratt's past behavior as a main reason for opposing Louis' return to Horace Mann. He stated that he felt that a proper placement for Louis did not involve a return to Horace Mann. Based upon his familiarity with Louis' problems, Barbee said he felt that the I.L.S.C. would be a proper place and would best meet the needs of Louis Pratt. Mr. Barbee stated that he made this recommendation with the best interests of Louis Pratt in mind.

Mr. Barbee testified that he had no meeting with Louis Pratt before suspending him on March 29, 1972. He stated that it was not until April 11, 1972, that he was contacted by Mr. Clinton and informed that a conference was scheduled for April 12, 1972, to discuss Louis Pratt's suspension. At the beginning of the conference, Mr. Barbee stated that he did not want Louis Pratt returned to Horace Mann Junior High and that this was the reason why he had referred Louis Pratt to Mr. Clinton. Mr. Barbee maintained that this desire not to return Louis to Horace Mann was previously manifested in his letter of March 29, 1972, to Mrs. Pratt.

### TESTIMONY OF MR. JAMES CLINTON

Also a witness on behalf of the defendants was Mr. James Clinton, a community counselor for the Omaha Public School System, who was present at the April 12, 1972, conference held to discuss Louis Pratt's suspension. Mr. Clinton stated that Miss Ferber, Mr. Barbee, and Mr. Correy were questioned by Mrs. Pratt and her attorney, Broom, in regard to their complaints about Louis' behavior. Miss Ferber's referral of Louis and her write-up of his problems were fully discussed. Mr. Barbee was questioned about his desire to place Louis at a school other than Horace Mann.

Mr. Clinton stated that on April 12, 1972, the I.L.S.C. was agreed upon as a

possible placement for Louis. However, he stated that testing performed on April 13, 1972, disclosed that Louis was not eligible for the I.L.S.C. Mr. Clinton stated that on May 23, 1972, he offered Mrs. Pratt a placement for her son in a special education class suitable for his needs. Mrs. Pratt told Mr. Clinton that she would not at that time place Louis in special education because of disbelief that "her son had tested that low", which might cause him to be placed in a special education class. Mrs. Pratt refused the offer of placement in a special education class and indicated that she would consult her attorney. In response to a question by Mr. Broom, Mr. Clinton stated that the purpose of the conference held on April 12, 1972, was to answer Mr. Broom's question of what Louis had been suspended for.

## TESTIMONY OF RENE HLAVAC

Doctor Hlavac stated that an offer of placement of her son, Louis, in a special education class was made to Mrs. Pratt on May 23, 1972, but has remained unaccepted. Doctor Hlavac stated that neither Mrs. Pratt nor her attorney, Broom, have ever asked for a hearing with him to discuss the placement problems encountered by Louis Pratt or to appeal the suspension of Louis Pratt by Mr. Barbee.

## FINDINGS OF FACT

The Court notes a direct conflict in the evidence of Mrs. Pratt and Principal Barbee with respect to the question of whether or not teachers who had charged Louis Pratt with misconduct attended conferences held beween Mrs. Pratt and Mr. Barbee. Mrs. Pratt testified that prior to April 12, 1972, she was never confronted with a teacher at a parental conference held to discuss her son's misconduct. Mr. Barbee testified that teachers confronted Mrs. Pratt at parental conferences held on October 1, 1970, March 27, 1971, and November 12, 1971. In the total absence of any rebuttal evidence by the plaintiff, the Court believes that Mrs. Pratt was, in fact, confronted with teachers who had alleged her son's misconduct at conferences held on October 1, 1970, March 27, 1971, and November 12, 1971.

The Court finds that on April 12, 1972, the facts surrounding Louis Pratt's suspension from Horace Mann were discussed. It finds that Mr. Barbee and Miss Ferber were questioned by Mrs. Pratt and her attorney, Broom, in regard to the reasons for Louis' suspension and why Mr. Barbee opposed Louis' readmission to Horace Mann. At this meeting, Mr. Barbee did recite previous disciplinary problems with Louis as his reason for opposing placement at Horace Mann, as well as his belief as a professional educator that placement elsewhere would best serve Louis' needs as a student and would also remedy his behavior problems. Mr. Barbee's opposition is found to be based upon his professional judgment that the best interests of Louis Pratt and those of other students at Horace Mann demanded placement at a location other than Horace Mann. Mr. Barbee did consider the history of disciplinary problems with Louis in arriving at his decision to recommend the placement of Louis Pratt at a school other than Horace Mann.

The Court finds that it was agreed at this time that testing was to be performed on Louis Pratt to determine his eligibility for the I.L.S.C. This was done on April 13, 1972. The results of this psychological testing were received on April 14, 1972, and indicated that Louis lacked the ability to successfully attend the I.L.S.C. and that placement there would not be suitable for him. However, this information was not communicated to Mrs. Pratt until May 9, 1972. Placement of her son in a special education class suited to his needs was offered to Mrs. Pratt on May 23, 1972. This offer of placement was not accepted by Mrs. Pratt because she indicated she desired an opportunity to discuss the matter with her attorney. The Court finds that the offer to Mrs. Pratt of placement of her son in a special education class was also made to her attorney, Broom, during the course of the Court's hearings. The

Court further finds that neither Mrs. Pratt nor her attorney, Broom, have ever asked for a hearing with Rene Hlavac, assistant superintendent for pupil personnel services for the Omaha Public School System, to discuss the placement problems encountered by Louis Pratt or to appeal the suspension of Louis Pratt by Mr. Barbee. Mrs. Pratt, however, has never received a final decision barring her son from Horace Mann.

## ADDITIONAL EVIDENCE DESIGNED TO SUPPORT A DEFECTIVE SYSTEM

By way of rebuttal testimony, plaintiffs presented the following additional witnesses:

Mrs. Ella Mae Robinson, for her son, Larry Green, appeared to testify on suspension. After repeated disciplinary problems, he was suspended by principal Barbee from Horace Mann Junior High for bringing beer to a June 5, 1972, school picnic.

Charles Russ, age 17, testified he was summarily dismissed from North High on November 11, 1971, without being told why. Vice principal Dick Davis, the suspending official, said he was ousted for shouting obscenities in the study hall. Miss Morgan, community counselor, on December 2, 1971, had a conference with Russ, who told her he did not want to return to school since he had a program involvement at Offutt Air Force Base.

The Court finds no lack of due process in either of the above cases.

Plaintiffs offered no rebuttal evidence disputing the documentary records of the school officials, nor of their recitation of the conferences and discussions as testified to by the defendant school officials.

Thus, this Court finds that the documentary evidence of all items offered by defendants, as well as their records of conferences, are true, and are so held as facts.

The Court noted with disapproval the attempt on the part of the plaintiffs' counsel to interject an issue of racial discrimination into the hearings. Thrice counsel for plaintiffs raised the issue of the color of the plaintiffs and their children as being "black." Never did counsel identify the color of the school officials concerned.

This Court notes that Mr. Clarence Barbee, the principal of Horace Mann Junior High, is a black man. This Court notes that Dick Davis, a statement taker of the Graham girl in the North High melee and the vice-principal of North High, and who recommended the suspension of Geraldine Graham, is a black man. Mr. James Clinton, the community counselor involved in the Pratt boy's investigations and testing, and who joined in the recommendation of his suspension from Horace Mann, is a black man.

Not one scintilla of evidence was demonstrated anywhere in the entire hearing that these people were being treated differently because of their racial origin.

This Court's findings, to the contrary of the above inferences, are that the conduct of Mr. Barbee, Mr. Davis and Mr. Clinton, as well as most of the other professional educators involved in this cause, demonstrated the highest spirit of desire to provide education, not only to these children, but to all others in the school. They exhibited educational professionalism of the highest quality, and this Court finds not one iota of reason to believe that their conduct was other than sincere and professional. With proper direction from their superiors, they were fully capable of judgment calling for the sensitivity of individuals of all origins. This includes the temporary elimination of any individual where the welfare of all students in the school system is considered. They demonstrated objectivity with total disregard to color or creed.

Any inferences to the contrary are wholly unsupported.

This Court cannot say that it discovered the same objectivity on the part of the plaintiffs.

### CONCLUSIONS OF LAW

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law".

■ The policies and regulations promulgated by the members of the defendant Board of Education of the School District of Omaha, adopted in accordance with the law of the State of Nebraska, and actions of the defendant superintendent of schools Knutzen and defendant assistant superintendent of pupil-personnel services Hlavac and defendant principals, Barbee and Gitlin and Reeves, pursuant to these policies and regulations, are clearly "state action." Thus, actions on the part of these defendants which would adversely affect the right of these minor plaintiffs to attend school to attain an education is a "right" afforded plaintiffs and is guaranteed them by the Fourteenth Amendment. West Virginia State Board of Education v. Barnette, 319 U.S. 624, at 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Cooley v. Board of Education, 453 F.2d 282, 285 (8th Cir. 1972).

■■ Whether attendance at a public school be characterized as a "right" or a "privilege", it cannot be disputed that it is of value to the student and deserving of constitutional protection. See Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). "Private interests are to be evaluated under the due process clause of the Fourteenth Amendment, not in terms of labels or fictions, but in terms of their true significance and worth." Knight v. State Board of Education, 200 F.Supp. 174 at 178 (M.D.Tenn.1961).

### THE NATURE OF DUE PROCESS

■ ■ As stated in Cafeteria and Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy, 367 U.S. 886 at 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961): "Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest which has been affected by government action." " * * * The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation * * *' "Due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions * * *' ".

■ The private interest which has been affected by the action of the defendants is the interest of the minor plaintiffs in attending school and obtaining an education.

■ The precise nature of the governmental function here involved is the inherent and statutory power of these defendants to "order the expulsion or suspension of any pupil from school for gross misdemeanors, immorality, persistent disobedience or for violation of the regulations, rules or policies, established by the Board (of Education) or when the presence of the pupil is detrimental to the best interests of the school . . ."

■ The clear rule in *Cafeteria Workers, supra,* is that "the minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interests of the parties involved." Dixon v. Alabama State Board of Education, 294 F.2d 150, 155 (5 Cir. 1961).

The diverse interests of the parties in this action were above noted as being that of the plaintiffs in obtaining access to the classroom, and that of the defendants as being maintenance of order and discipline in the same classroom. What, then, are the minimal procedural requirements necessary to satisfy due process when steps are taken by school authorities to deprive a student of access to the classroom for even the shortest period of time?

■ Several decisions of the United States Supreme Court serve to emphasize that when substantial private interests are effected by governmental action, procedural due process demands "notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). This notice and opportunity for hearing "must be granted at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

"This is no new principle of constitutional law. * * * Although the Court has held that due process tolerates variance in the *form* of a hearing 'appropriate to the nature of the case,' Mullane v. Central Hanover Tr[ust] Co., 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865, and 'depending upon the importance of the interests involved and the nature of the subsequent proceedings [if any],' Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, the Court has traditionally insisted that, whatever its *form*, opportunity for that hearing must be provided before the deprivation at issue takes effect." Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

■ Ordinarily by affording the student definite notice of the charge against him, by whom it is made, an opportunity to confront a teacher who has accused him of misconduct, or who has found facts unfavorable to him, and a chance to tell his version of the facts, the student receives procedural due process of law in that he has been given notice and an appropriate opportunity to be heard in his own behalf before he is suspended. When a student has been charged with misconduct such as would dictate his removal from the school, procedural due process requires that a hearing such as described above must be given a student on the question of his responsibility for conduct which is punishable by suspension. See Sniadach v. Family Finance Corporation, 395 U.S. 337 at 343, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (Harlan, Justice, concurring); Goldberg v. Kelly, 397 U.S. 254 at 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Fielder v. Board of Education of School District of Winnebago, 346 F.Supp. 722, Chief Judge Warren K. Urbom, U. S. District Court, District of Nebraska, 1972.

■ Such dispatch protects the interest of both student and school. The student is either allowed to continue in attendance or is suspended, and his parents are immediately notified by school administrators that their child has been suspended from school. The power of school officials to summarily deal with serious breaches of discipline remains unchanged. The Court concurs with and supports wholly the following recent remarks of the Honorable Chief Judge of this District: "Some situations may arise in which" a suspension "prior to a hearing is constitutionally justifiable, such as when the misconduct is so gross and the atmosphere of the school so tense that substantial disruption is highly probable unless instant" removal from the classroom and school premises is had.

" '(D)ue process of law' generally applies and includes *actor rues judex*, regular allegations, opportunity to answer and a trial according to some settled course of judicial proceedings, * * * yet this is not universally true." Murray's Lessee v. Hoboken Land and Improvement Company, 18 How. 272, 59 U.S. 272, 280, 15 L.Ed. 372 (1855).

■ "A procedural rule that may satisfy due process in one context may not necessarily satisfy due process in every case. Thus procedures adequate to determine a welfare claim may not suffice to try a felony charge. Compare Goldberg v. Kelly, 397 U.S., at 270–271, 90 S.Ct. [1011] at 1021–1022; with Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)." Bell v. Burson, 402 U.S. 535 at 540, 91 S.Ct. 1586 at 1590, 29 L.Ed.2d 90 (1970). Procedural due process in a pre-suspension hearing conducted by a school princi-

pal or school administrator on the school's premises does not require that the anonymity afforded to students who forward information to a school principal or administrator be destroyed.

Confrontation and cross-examination of teacher, of administrator witnesses or accusers, or a confrontation of the facts which a teacher or administrator's interviews with students have disclosed, give a student seeking to preserve his right of access to the classroom notice of the charge against him, as well as an opportunity to rebut it before a decision is made as to whether the facts presented by both the student and his detractors merit his suspension.

Plaintiffs' brief contends:

"To be meaningful, due process must be provided prior to the suspension or expulsion: *Minimal* due process requires a statement of the specific charges and *a hearing preserving the rudiments of an adversary proceeding, including cross-examination* and an ample opportunity for both sides to present their cases before an impartial person or tribunal." (emphasis added)

In this regard, it is noted that " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. * * * Whether the Constitution requires that a particular right obtained in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, *and the possible burden on that proceeding*, are all considerations which must be taken into account * *." Hannah v. Larche, 363 U.S. 420 at 442, 80 S.Ct. 1502 at 1514, 4 L.Ed.2d 1307 (1960).

■ With regard to "confront"-(ation), the Court holds that students who give information to teachers or administrators are often the subject of reprisal from students about whom information was given. It is for this reason that the Court declines to impose the requirements of confrontation and cross-

examination of student witnesses or accusers as a necessary element in the on-the-premises hearing which must be conducted by a school principal or administrator before a student is suspended. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ The Court finds due process is in fact followed when an investigatory act is taken by the building principal on an oral statement of charges, if the opportunity to answer the charges is presented the student who may be suspended. It is clear that usually the building principals conduct their own investigation, and in nearly all cases, end up with a confrontation of the student. An exception, of course, occurs if the suspension arises from unexplained absences and the student is not available. This confrontation and the opportunity to explain his side gives the student a chance to challenge the facts. The Court holds this is due process.

Assuming further that the student is then removed from the school by suspension, the school requires notice to be sent to the superintendent's office and to the parents, who then have the opportunity to have a second "conference-hearing," at which, again, the facts may be challenged. The superintendent additionally may either order a community counselor to secure additional facts or to review the evidence and have a conference with the individual school principal. The principal may be overruled and the child immediately reinstated. When directed by the superintendent, the community counselor rechecks the facts, and he may further visit the home environment of the student, plus have one or more conferences with the parent, school officials, and other interested parties, either individually or together, and this constitutes a second step of fact finding in procedural due process. This is now provided as a part of the system to the people of Omaha.

The third step, of course, is the right of the student and his legal custodian to go before the assistant superintendent for pupil personnel services for a hear-

ing. The fourth step is the appeal to the School Board.

To interject a "trial," handled by "outside" parties who are not charged with the responsibility of the conduct of the schools, would deny authorities the control they need for the intelligent operation of the schools.

Constitutional due process just doesn't require an "outside intermediary." To interject a court-type trial over misbehavior would prevent the utilization of the common interest of the home and school, in concert, to solve the student's behavior problems. Secondly, it would prevent placing him in an educational environment where his special needs can be served. Thirdly, it would not resolve personality difficulties between the parties, if any.

■ It is the belief of this Court that the schools' general system does give the right to the ousted student to be heard, with adequate hearing opportunity so as to qualify for that degree of due process constitutionally required.

■ To achieve an analysis of the educational welfare and proper placement of the student in an educative environment for his best learning opportunity and for the benefit of the remaining students for their general educative interests takes time. This with the best of intentions may take more time than a day, or even a week. Testing takes time—conferences take time—investigations take time. Consultations with outside interested third parties take time.

*However, two or three months is unreasonable and excessive and constitutes constructive expulsion even though no formal expulsion has been decreed.* This time element must be greatly lessened by appropriate directions. Thus, if the reason for the delay is occasioned by the refusal to cooperate on the part of the student and the parent or guardian, then a definite time and adequate notice of hearing setting out the reasons for the student's removal therefrom, must be timely sent to the student and parent, together with any recommendation and

terms for reinstatement which should be spelled out in such a notice.

The Court is aware that the delays may be partially justified because of the intense subjective character of the individual problems facing educators of children in general, some of whom have environmental, social and intellectual differences. These differences tend to create great difficulty in the management of problem children, to the end that their best interests and the interests of all other students are properly served.

For example, initiating cooperative conferences with parents or guardians with the school officials charged with the achievement of proper educational goals above discussed, certainly can be justified. Delays caused by lack of cooperation on the part of parents or guardians, whose aims ought to be common with those of the school, namely, the best educative circumstances for the individual child, and all other school children, offer a critical obstacle—one certainly not to be laid at the feet of the school administrators.

When a lack of cooperation occurs, occasioned by those in charge of the home environment of the child, the school administrator still has a duty, however, to arrive at a definitive finality and administrative conclusions without delay.

■ If the child and his home environment make it impossible to keep him in the school without destruction of the school purposes, the Court feels the appropriate child supervisory agencies of the State, which are charged with legally requiring school attendance for those under sixteen years of age, should be consulted.

The Court does find, however, that clear direction to principals and community counselors for their conduct in this area has not been sufficiently defined. It is apparent that a variety of opinions exist among defendant administrators as to the nature and responsibilities for removal of children from the schools.

It is recognized that on many occasions such removal will have nothing to do with bad conduct and may occur because of the presence of a communicable disease. Removal may occur for reasons of safety. A judgment must be exercised by someone who is responsible for control of the schools and students. A rule requiring hearings does not lend itself to most instances where removal is ordered. These judgments must be made by those in the educational hierarchy charged with the responsibility for the conduct of the schools. Even where they are occasionally in error, the system itself is not basically faulty because of the exercise of power by responsible officials.

■ The errors, if they be chargeable to the administrators in the instant cases, are chargeable to non-feasance rather than mis-feasance. By not giving final answers, by not giving clear statements of the position of the schools, in writing and timely executed, the school district officials are guilty of inadequate notice of their final decision to the child or parent concerned whose rights are at issue. The School Board should, therefore, set up procedures and time factors so this will not be repeated. Anyone ousted from school ought to know what his options are. The parent of the child should know what options are involved. With the time lag involved in these three cases, it is obvious that a definitive answer, however harsh, was not provided.

Failure to make timely such conclusions and the opportunity to be challenged by the child and his legal custodians is a failure of the due process. It denies the child his rights to attend school, either in public school or an appropriate institution if he is found incorrigible.

■ Regardless of the recalcitrance of the parents and the child in the administrative efforts to work out improvement of student conduct by conferences, the removed child and his custodians should have an answer from the school: (1) defining his expulsion; (2) the reasons therefor; and (3) such procedures, if any, to be complied with

before reinstatement is allowed. The definite responsibility must be stated in writing to those school officials to whom the power is granted. The previous "oral" directions should be included in the written directions.

The Board of Education should have ten days from this date to submit to the Court such amended procedures for approval herein.

■ The bellwether case of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5 Cir. 1961), disclaims any intent to require "a full-dress judicial hearing, with the right to cross-examine witnesses," such as is required in a criminal case, as a necessary element of the procedural due proces to which a student is entitled before being suspended. The limited controversy to be resolved in a pre-suspension hearing is the determination of the student's immediate fitness for continued attendance in the classroom.

■ Hearings, which the Court today orders the Omaha Public School System to have its principals and administrators conduct as a matter of course before suspending a student, are directed solely to this end. It cannot be reasonably said that the hearing which is now required to be given a student before a school principal or administrator exercises his discretion to suspend is in any way a criminal proceeding. Madera v. Board of Education of City of New York, 386 F.2d 778 at 780 (2 Cir. 1967).

The Court holds that the prayer of the plaintiffs' complaint can be supported only in a very limited degree.

Specifically answering the prayer of the complaint, the Court responds to each request:

1) Plaintiffs' request for an "impartial hearings officer" to be involved before a student is removed from the classroom or public school is not legally justified or necessary.

2) This Court holds that the fact-finding procedure of the school principals and the staff, together with appropriate confrontation as above discus-

sed, does constitute due process as warranted under the circumstances.

3) In case of full expulsion, after appropriate notice is given to the student and his parent or guardian, and a hearing date is set in the superintendent's office, a second step in due process is provided as called for under the circumstances.

4) This Court finds no merit and cannot grant the request that "an expungement from the school records" of the three plaintiff students outlining their conduct in the schools be done. It is neither warranted nor advisable. Disruptive misconduct can be cumulative. In each of the specific cases involved here, the misconduct of the three plaintiff students has been over a period of time. Cumulative records are necessary aids for intelligent determination of a student's fitness to remain in school.

5) Regarding plaintiffs' prayer that "specific standards of conduct" be fixed which will become the bases for expulsion, such judicial order would clearly usurp the control of the educational environment which the school operators must determine in the interests of the welfare of *all* students of the school. These criteria cannot be rigid. Any definite set of specific "don'ts" opens a broad field for experimental misconduct which would destroy the aims and goals of education. Disruption of other students' welfare must often be judged subjectively.

6) An "impartial hearing officer," outside the administrative personnel of the Omaha School System, as suggested by counsel for the plaintiffs, would destroy effective control over the schools by the people so charged by statute for their management. Such an invasion of the legal responsibility, now cast by the law upon the School Board and its Administration, would deny the school people the duty and power to control the school environment toward the ultimate ends of proper education. This the Court will not do.

The interests of these minor plaintiffs' proper school attendance has previously been dealt upon at some length. Their substantial interest in being allowed access to the classroom is clear. The interests of the defendants in maintaining a tranquil atmosphere in the individual classroom as well as in the school facility as a whole is likewise clear. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503 at 507, 89 S.Ct. 733 at 737, 21 L.Ed.2d 731, it was stated that the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." The issue thus presented is whether Section 6.7a and 3.-28e of the policies and regulations of the school district of Omaha, which invest a principal or other school administrator with the authority to suspend a student from school are unconstitutional on their face for failure to require that notice and opportunity to be heard regarding the charges against him be given a student before he is suspended.

Regarding the request to require confrontation of all witnesses uncovered in the investigation and for a criminal-type due process hearing on a student's misconduct, this Court will not so require, since it not only would be burdensome, unrealistic, but additionally would destroy educational opportunities for any truth-speaking student witness whose forthrightness would subject him to retribution as well as deny his right to use such time to his own educational advancement. This the Court will not require.

■ With respect to the claim for damages, the record clearly shows that culpability for the non-attendance of the three plaintiffs falls at least as heavily upon the parents concerned as upon the school system.

In the case of the Graham girl, the parent insisted on the locus of her daughter's continued education with complete arbitrariness. Mrs. Graham presumed to make the ultimate decision with an apparent total disregard for the

tense situation those in charge of North High School had. Her attitude was, of course, reflected in the actions of her daughter.

Mrs. Cooperrider hardly was the epitome of cooperation in an effort to resolve her son's phychiatric and educational problems. She either fended off, or rejected, invitations to cooperate in securing his return to school. Her son's attitude of rejection naturally followed.

Mrs. Pratt, through her direct testimony, apparently chose to ignore the history of difficulty that her son had in school and exhibited little in the spirit of cooperation with the school officials in appropriately placing her son to his best benefit.

This above conduct hardly gives rise to the claim for damages when this Court believes the culpability lay heavier by far on the parent than on any neglect by the School District.

 Although dismissed earlier, at this point in the Court's discussion, the defendants' argument that the minor plaintiffs were not denied the right to attend school but merely the right to attend the particular school of their choice now takes on importance. School officials possess inherent authority to maintain order in the premises under their control. See Tate v. Board of Education of Jonesboro, Arkansas, Special School District, 453 F.2d 975, 978 (8 Cir. 1972). The statutory authority of school officials in the State of Nebraska to bar a student from the classroom is found in Section 79.499, R.R.S. Neb.1943, which provides: "The school board or board of education may authorize or order the expulsion or suspension of any pupil from school * * * when the presence of the pupil is detrimental to the best interests of the school * * *. The board may exclude from school * * * any child whose presence in school may be injurious to the health or morals of other pupils or to the welfare of such school." School authorities have then "both the inherent and the statutory power to maintain order and discipline in the schools and to exclude from the student body those who are detrimental to such body and whose conduct is inimical to the exercise of the institution's scholastic function." Davis v. Ann Arbor Public Schools, 313 F.Supp. 1217, 1225–1226 (E.D.Mich.1970). Thus, it is clearly within the power of school officials, although not denying the right of a student to attend school within the school district of Omaha, to bar a student from attending the particular school of his choice if the presence of a particular student in the classroom or the building as a whole, can reasonably be anticipated to result in a disruption of the educational mission of the school.

 This Court recognizes that in nearly all cases, the procedures used for consultation with parents, consideration of home environment, investigations for facts, and educative tests to define the best opportunity for the student involved are time consuming, if carefully done. However, whenever these exceed reasonableness for the ousted student and his parent, suitable written explanations for the delay ought to be made. In all cases where such cannot be honestly made, then the school administration should concentrate its efforts on an early investigation, conclusion and final decision, which should be posted in writing to the person who is ousted and the parent. Herein, the schools need to set up a definite set of standards and regulations so that all people involved in the administration of the problem children may know precisely what is expected and *when* they are to act, all as explained and ordered above.

Hopefully, the desirable procedures now used by the Board of Education resolving student disciplinary problems by seeking cooperation from the adults in charge of the student removed from school will not become a casualty by virtue of this order. Such procedures used in the search for common purposes of home and school in solving discipline problems are in the best interests of everyone. It is also in the best interests of orderly school administration and should be preserved. Timely exclusions,

however, must be arrived at without delay.

### ORDER

Pursuant to the findings of fact and conclusions of law as set forth in the Memorandum Opinion filed herein,

It is ordered that the defendant Members of the Board of Education of the School District of Omaha, are directed to submit to this Court within ten (10) days, for its consideration and approval, such written amended procedures concerning the removal of any child in the Omaha Public School System from attendance therein for disciplinary reasons, such amendments to include specifically provisions for notifying the child and his parents or guardian the reason for his removal from school, the extent of his removal, and what procedures, if any, must be complied with before his return, all in keeping with the conclusions and directions of the memorandum filed herein.

It is ordered that all other objects and prayers of the plaintiffs' complaint are dismissed.