Brandon TUN, by his next friends, David TUN and Denise Tun, Plaintiff,

v.

**FORT WAYNE COMMUNITY SCHOOLS, et al.,** Defendants.

No. 1:03CV217.

United States District Court, N.D. Indiana, Fort Wayne, Division.

July 22, 2004.

William Randall Kammeyer, Hawk Haynie Kammeyer & Chickedantz LLP, Fort Wayne, IN, for Plaintiff.

Andrew Sean Williams, Hunt Suedhoff Kalamaros LLP, Craig R. Patterson, Matthew J. Elliott, Beckman Lawson LLP, Scott L. Bunnell, Hunt Suedhoff Kalamaros LLP, Wendy W. Davis, Beckman Lawson LLP, Fort Wayne, IN, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

Imagine you are taking a shower in your high school locker room when some guy comes in and takes your picture. Would you be shocked if that led to your being expelled for public indecency? What if the guy handed you the negative, do you now possess pornography? These questions essentially frame what this case is about, because our Plaintiff, Brandon Tun ("Tun"), was charged with and later expelled from school for just those violations.

More precisely, the school's hearing officer ordered Tun expelled for "allowing" another student to take photos of him while showering. Tun thinks this is a bit heavy-handed, so he has made a federal lawsuit out of it. Of course, there is more to the tale, as the reader will soon discover, but at its core it asks this legal question: Is it a violation of a student's substantive due process rights to expel him for "public indecency" simply because his photograph was taken while showering in a school locker room?

Tun, by his parents, brings this lawsuit under 42 U.S.C. § 1983, alleging that his expulsion from Wayne High School ("Wayne") violated his due process rights. Tun also asserts various state law causes of action under this Court's supplemental jurisdiction. 28 U.S.C. § 1367. The Defendants are Fort Wayne Community Schools ("FWCS"), Wayne's principal, Joselyn Whitticker ("Whitticker"), two Wayne wrestling coaches, Gregory Rhodes ("Rhodes") and David Mohr ("Mohr"), and the expulsion hearing examiner, Judith Platz ("Platz") (collectively "the Defendants").

This matter is before the Court[1] on the Defendants' motion for summary judgment and Tun's motion for summary judgment on his substantive due process claim. For the reasons supplied in this opinion, the Defendants' motion for summary judgment will be GRANTED in part and DENIED in part, and Tun's motion for summary judgment on his substantive due process claim against Whitticker and Platz will be GRANTED.

## II. FACTUAL BACKGROUND

On February 5, 2003, Mohr, Wayne's photography teacher and assistant wrestling coach, became suspicious when he saw Tun, a member of the wrestling team, giggling while looking at some photo negatives. (Platz Aff., Ex. 9 at 2; Mohr Dep. at 27–32.) After asking Tun where he obtained the negatives, and learning they came from the wrestling team's manager, Constantine,[2] (sometimes referred to in

---

1. All parties have consented to the Magistrate Judge. See 28 U.S.C. § 636.

2. The record does not reveal Constantine's full name.

the record as "Konstyantyn"), Mohr confiscated them and noticed that they depicted four nude boys showering in Wayne's locker room. (*Id.*)

Mohr took the negatives to his office and showed them to Rhodes, the head wrestling coach. (*Id.*) Mohr then took the negatives to John Hester ("Hester"), a Wayne administrator, who asked Mohr to develop the negatives to more clearly determine who was involved. (*Id.*) After developing the negatives, Mohr handed the prints to Hester; he later noted that the photographs were on film issued to students in his photography class. (*Id.*)

Wayne officials then began an investigation, headed by assistant principal Eric Augsburger ("Augsburger"). During that investigation, Augusburger obtained written statements from the four boys in the photos, as well as Constantine, who turned out to be the photographer. (Platz Aff., Ex. 2–7.) Constantine alleged that the four boys asked him to take their picture. (*Id.*, Ex. 4.) This confirmed Mohr's suspicions that Constantine would not have initiated this conduct on his own. (*See* Mohr Dep. at 32.)

One of the boys reported that they "play[ed] along with" the photo shoot because they "didn't know there was any film in the camera." (*Id.*, Ex. 2.) Another stated that he "wasn't worried" about his picture being taken because he "didn't think the [photo lab] would develop the pictures." (*Id.*, Ex. 3.) For his part, Tun admitted that the whole thing was "a stupid idea" but that everyone was "just joking around[.]" (*Id.*, Ex. 6.) Nevertheless, Tun now claims, although he did not say so at his expulsion hearing, that he objected when Constantine started to take the photos, telling him to "get out of here." (Tun Dep. at 47.)

Augsburger reported the results of his investigation to Whitticker, who ordered him to suspend Tun and the other boys for public indecency, pending a further investigation. (Whitticker Dep. at 6–7.) Several days later, Whitticker and various Wayne administrators met with each boy and his respective parents. (*Id.* at 18.) Prior to meeting with Tun and his parents, Whitticker showed the four unredacted photographs to each set of parents, so all the other parents saw photographs of all four boys in the shower. (*Id.* at 21.) However, because some parents complained about revealing the contents of the photos to strangers, by the time the Tuns met with Whitticker, they were only shown those parts of the photos that depicted Brandon.[3] (*Id.*)

At about the same time, Platz, who eventually would be the expulsion examiner, discussed the case with FWCS's Security Director, John Weicker ("Weicker"). In that discussion, Platz offered the opinion that Wayne school officials should file for expulsion, which Weicker passed on to Augsburger. (*See* attachment to December 29, 2004, letter of attorney Elliott.)

Following the parent meetings, Whitticker began expulsion proceedings based on alleged violations of Rule 22 and Rule 24 of the FWCS Behavior Code. (Platz Aff., Ex. 1.) Rule 22 prohibits "[p]articipating in inappropriate sexual behavior including . . . public indecency on school property[.]" (Platz Aff., Ex. 12 at 12.) Rule 24, entitled "Pornographic Material," prohibits "[p]ossession and/or distribution of pornographic material which would reasonably be considered offensive by community standards for students, which are without redeeming social value[.]" (*Id.*)

---

3. Purportedly as part of the investigation, some Wayne school personnel and their assistants also saw the photos. (*See* Def. Interrog. Resp. No. 5.)

On February 18, 2003, Platz presided over Tun's expulsion hearing. (Platz Aff., Ex. 9.) At that hearing, the written statements of the boys and of Mohr were read into the record. (*Id.* at 3–5.) Platz then engaged in the following colloquy with Tun:

> HO [hearing officer—Platz]: Brandon, this is your opportunity to respond to the information that's been presented. Um, do you _____ the information that's presented is accurate?
>
> BT [Tun]: As far as what?
>
> HO: Whatever was presented, you had a written statement that was submitted, and the photos that were taken.
>
> BT: No.
>
> HO: What don't you agree with?
>
> BT: No, I agree with it.
>
> HO: Speak clearly.
>
> BT: The thing I don't agree with is the dates and when they said it happened. I'm not sure, but from what I remember I thought it was after sections, Saturday, February 1st.
>
> HO: Okay. There were pictures taken. The young man was in the camera, in the locker room with a camera?
>
> BT: Yes.
>
> HO: And he did appear to be taking pictures?
>
> BT: That's what it appeared to be. I didn't know there was film in the camera and [he] was actually gonna take pictures of us.
>
> HO: And did you ever ask him to stop, taking photos or acting like he was taking photos?
>
> BT: (Inaudible)
>
> HO: Did he ask you or did anyone in your group ask him to take pictures?
>
> BT: No.
>
> HO: So at the time you knew he had a camera, you knew he was acting as though he was taking film.
>
> BT: Yes.
>
> HO: You did not ask him to stop, correct? Were you upset at the time he was doing it?
>
> BT: I wasn't happy about it. I didn't really care cause I was taking a shower.
>
> HO: Did you pose?
>
> BT: No, I was taking a shower.

(*Id.* at 5–6.)

Tun's attorney also briefly questioned Tun and then offered oral argument, during which he correctly noted that FWCS's Behavior Code does not permit expulsion for a violation of Rule 24, the possession of pornographic material. (*Id.* at 7–8; *see* Platz Aff., Ex. 12 at 12.) Thus, he argued that Tun could only be expelled if there had been a violation of Rule 22, but under that rule Tun's behavior could not be deemed "inappropriate sexual behavior" or "public indecency," because the only thing he did was take a shower in the locker room after wrestling practice. (*Id.* at 8.)

Nevertheless, on February 24, 2003, Platz issued a written decision expelling Tun until May 30, 2003, for violating Rules 22 and 24 (Platz Aff. Ex. 10), a decision she supported with these findings:

> Brandon Tun allowed another Wayne High School student to take photographs of him while nude in the boys' locker room. Brandon did not ask the student to stop taking pictures. He did not report the incident to any adults at Wayne High School.
>
> Brandon was in possession of the negatives of the photographs of himself and three other male students.

(*Id.* at 6.)

Tun appealed Platz's decision, and on March 19, 2003, Platz's decision was reversed by a FWCS administrator, permit-

ting Tun to return to Wayne. (Platz Aff., Ex. 11.) Because of this reversal, Tun's disciplinary record does not reflect his expulsion. (Platz Aff. ¶ 6) Nevertheless, as a result of the expulsion, Tun missed about six weeks of school and some extracurricular activities.

On June 13, 2003, Tun filed this action. However, his complaint is a confusing mix of legal and factual assertions, but his briefs assert three broad claims.

First, Tun alleges a procedural due process violation under the Fourteenth Amendment concerning his expulsion, specifically that his procedural due process rights were violated by Platz's alleged *ex parte* contact with Weicker (which Tun considers evidence of Platz's bias)[4] and her subsequent refusal to allow Tun's counsel to see Constantine's written statement at the expulsion hearing.

Tun also asserts, apparently as a state law claim, that the two wrestling coaches, Rhodes and Mohr, were negligent in failing to supervise the locker room, either because all teachers and coaches have a general duty to supervise students or because Wayne's supervision policy imposed that specific duty here. (*See* Tun's Mem. in Opp'n at 10.) On top of this assertion, Tun argues an official capacity claim under § 1983 based on FWCS's policy of having "different facilities for girls in the locker room showers than ... for boys." (*Id.* at 12–13.)

Finally, Tun's substantive due process claim is based on his assertion that Whit-

ticker sought, and Platz imposed, an expulsion under Rule 24 of the Behavior Code even though expulsion is not available under that Rule, and also because there is a total lack of evidence that he violated Rule 22, the other basis for his expulsion. Tun augments these assertions by again complaining about Platz's *ex parte* communication and purported bias, as well as Whitticker's display of Tun's shower room photos to other school officials and the parents of the other boys.[5] (*See* Tun's Supp. Brief in Supp. at 2–4.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley,* 337 F.3d, 767, 770 (7th Cir.2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The Court's only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (quoting *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Id.* A court must construe the record in the light most favorable to the nonmoving party and

---

4. Tun's claim of Platz's specific bias towards him follows an earlier agreed dismissal of Count II of his Complaint, which alleged that Platz was generally biased because she always ruled in favor of FWCS at expulsion hearings.

5. If Tun ever alleged a state law invasion of privacy claim he has wisely abandoned it, *see, e.g., Brown v. Wabash Nat'l. Corp.,* 293 F.Supp.2d. 903, 905 (N.D.Ind.2003), as he

has made no effort to establish any of the necessary elements to support a claim that there was a public disclosure of private facts, *Nobles v. Cartwright,* 659 N.E.2d 1064, 1074–77 (Ind.Ct.App.1995), even if it could be assumed, a doubtful proposition at best, that such a claim exists under Indiana law, *see Doe v. Methodist Hospital,* 690 N.E.2d 681, 693 (Ind.1997).

avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

### A. General Principles

When it comes to disciplinary matters, this Court is to resist the temptation to become à super-school board by substituting its judgment for that of school administrators. The Supreme Court cautions that "[i]t is not the role of the federal courts to set aside the decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The Seventh Circuit also has emphasized that federal courts must "refrain from second-guessing the disciplinary decisions made by school administrators." *Gabrielle M. v. Park Forest–Chicago Heights, Illinois School District 163,* 315 F.3d 817, 825 (7th Cir.2003) (citing *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)). With those principles in mind, the Court now turns to the issues.

### B. Tun Has No Constitutional Claim Against FWCS or the Other Defendants in Their Official Capacities as a Matter of Law

■ "*Monell v. Department of Social Services,* 436 U.S. 658, 690, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), holds that the doctrine of *respondeat superior* may not be used to fasten liability on a local government in a suit under section 1983." *Gernetzke v. Kenosha Unified School Dist.*

*No. 1,* 274 F.3d 464, 468 (7th Cir.2001); *see also Cornfield by Lewis v. Consolidated High School District No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993). A municipality can be liable under Section 1983 only for acts taken pursuant to its official policy, statement, ordinance, regulation or decision, or pursuant to a municipal custom. *Monell,* 436 U.S. at 690, 98 S.Ct. 2018.

An unconstitutional "custom" or "policy," as required to hold a municipal entity liable for constitutional violations under § 1983, can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. *Brokaw v. Mercer County,* 235 F.3d 1000, 1013 (7th Cir.2000). In addition, to establish municipal liability a plaintiff must show that enforcement of the policy was the "moving force" behind the constitutional violation. *See Cornfield,* 991 F.2d at 1324. Stated simply, "[t]here must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 479 (7th Cir.1997) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Tun points to no FWCS policy, practice or custom as the culprit behind his expulsion. The closest he comes to ferreting out a policy is his cursory argument that FWCS has a policy of having individual shower stalls for girls but communal showers for boys, and that a jury could conclude that this resulted in Constantine "be-

ing able to take pictures."[6] However, Tun cites to no evidence to support this assertion, and a "mere allegation" is patently insufficient to defeat a motion for summary judgment. Fed.R.Civ.P. 56(e). Moreover, even if Tun's unsupported allegation is accepted as fact, and if the Court also indulges the doubtful proposition that a mere architectural design can be a "policy, custom or practice," Tun's claim still fails because no jury could possibly infer that this so-called "policy" is directly or causally linked to his expulsion. *Lanigan,* 110 F.3d at 478.

This means that in order to make out an official capacity claim, Tun's only alternative is to show "that the district itself, which is to say the officials or official boards that constitute the relevant final decisionmaking authority ... was directly responsible for the deprivation." *Gernetzke,* 274 F.3d at 468 (citing *McMillian v. Monroe County,* 520 U.S. 781, 784–85, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Horwitz v. Board of Education,* 260 F.3d 602, 619 (7th Cir.2001); *Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir.1998)). This requires that Tun establish that "the actor, ... the decisionmaker—was at the apex of authority for the action in question." *Gernetzke,* 274 F.3d at 468 (citing *Eversole v. Steele,* 59 F.3d 710, 716 (7th Cir.1995)).

Reduced to that simple equation, Tun's official capacity claim clearly fails. None of the school officials he has sued, presumably in their official capacities (although he is notably silent on that point), are decisionmakers "at the apex of authority for the action in question." *Gernetzke,* 274 F.3d at 468. Whitticker, as Wayne's principal, does not have final authority concerning school expulsions. *See Oliver v. McClung,* 919 F.Supp. 1206, 1213 (N.D.Ind.1995) (holding that Indiana school principals have not been delegated final decision-making authority). Likewise, Platz clearly does not have final authority to expel Tun, because her decision to do so was ultimately reversed by a school administrator. Finally, Tun does not contend that either Rhodes or Mohr, the two wrestling coaches, took any action to expel him, let alone that they had authority to do so. Therefore, because Tun has failed to establish any basis for liability against FWCS or the other Defendants in their official capacities under § 1983 as a matter of law, summary judgment on this claim will be granted.

## C. Tun's State Law Negligent Supervision Claim Against FWCS. Also Fails

Although Tun's brief on the subject is sparse, he seems to claim that FWCS is liable because Rhodes and Mohr negligently failed to follow a FWCS locker room supervision policy, and as a result, Constantine had the opportunity to photograph Tun and the other wrestlers in the shower. On this supplemental jurisdiction claim, 28 U.S.C. § 1367, Indiana state law applies, *see Timmerman v. Modern Indust., Inc.,* 960 F.2d 692, 696 (7th Cir. 1992).

At the outset, Tun's claims against Rhodes and Mohr fail as a matter of law because there is no genuine issue of material fact that would give rise to even an inference that they were acting outside the scope of their employment. Thus, any

---

6. Tun also argues that Rhodes and Mohr were negligent in failing to supervise the locker room, allowing Constantine to roam around with a camera taking pictures of naked boys, but this assertion does not make out a claim because "[n]egligence or even gross negligence does not suffice to give rise to liability under § 1983." *See Lewis v. Anderson,* 308 F.3d 768, 773 (7th Cir.2002).

cause of action against them individually for negligent supervision, as opposed to FWCS, is barred, *see* Ind.Code § 34–13–3–5(a), and Tun does not argue otherwise.

In order to recover on a theory of negligence against FWCS, Tun must establish that: (1) it has a duty to conform its conduct to a standard of care arising from its relationship with him, (2) it failed to conform its conduct to that standard of care, and (3) he suffered an injury proximately caused by the breach. *Estate of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind.2003) (citing *Miller v. Griesel*, 261 Ind. 604, 308 N.E.2d 701, 706 (1974)).

As to the first element, school personnel have a duty to exercise ordinary and reasonable care for the safety of the children under their authority. *Beckett v. Clinton Prairie School Corp.* 504 N.E.2d 552, 553–554 (Ind.1987) (citing *Miller*, 308 N.E.2d at 701; *Norman v. Turkey Run Comm. Sch. Corp.*, 274 Ind. 310, 411 N.E.2d 614 (1980)). Therefore, Mohr, Rhodes and FWCS had a legal duty to exercise ordinary and reasonable care while supervising Constantine and the other students in the locker room. *Miller*, 308 N.E.2d at 706.

■ However, teachers and schools are not insurers of pupil safety, nor are they strictly liable for any injuries that may occur to a student; rather, the conduct of school officials will be legally assessed by determining whether they exercised their duty with the level of care of an ordinarily prudent person under the same or similar circumstances. *Id.* This factual determination is generally a jury question.

"Of course what constitutes due care and adequate supervision depends largely upon the circumstances surrounding the incident such as the number and age of the students ..., the activity in which they were engaged, the duration of the period in which they were left without supervision, the ease of providing some alternative means of supervision and the extent to which the school board has provided and implemented guidelines and resources to insure adequate supervision." *Id.* Obviously then, as the Indiana Court of Appeals has recognized, "the duty imposed upon Indiana schools to protect their students has been necessarily defined by the specific circumstances of each case." *McClyde v. Archdiocese of Indianapolis*, 752 N.E.2d 229, 233 (Ind.App.2001). Nevertheless, some important guideposts emerge from the cases addressing the interrelationship between a school's duty to supervise and its standard of care.

Perhaps the most salient authority is *Norman*, a case where two elementary students were injured after colliding on a crowded playground while running. On appeal, the Indiana Supreme Court considered whether the trial court correctly granted summary judgment for the school on the claim that it breached its duty of care to its students by providing insufficient recess supervision. The Court held that "[s]ince running on the playground did not present a dangerous or unusual condition, under no set of facts presented to the jury could it be said that a duty arose on any of the teachers or all of them to pay particular attention to a particular student who was running." *Norman*, 411 N.E.2d at 618. Moreover, as the Indiana Supreme Court observed, "[e]ven perfect attention to this incident might not have prevented it. To hold the school personnel liable under the set of facts presented here would require them to be insurers of the safety of children in their care...." *Id.*

Similarly, in *Ashcraft v. Northeast Sullivan County School Corp.*, 706 N.E.2d 1101, 1104 (Ind.Ct.App.1999), a high school cheerleader was injured while participating in a fundraising car wash when an

automobile parked on an incline rolled into her. She sued the school corporation for negligence, alleging that the cheerleading coach failed to properly supervise and maintain the safety of the students. The trial court granted summary judgment for the school and on appeal, the Indiana Court of Appeals affirmed, even though it found that the school and the coach "owed a duty to take reasonable measures for the safety of the students participating in the fundraiser." *Ashcraft*, 706 N.E.2d at 1104. The Court held that, nevertheless, under no set of facts could it be said that the coach breached her duty of reasonable care by not paying "perfect attention" to the plaintiff at all times. *Id.* at 1105.

Based on these authorities, Indiana courts would undoubtedly find that Tun has failed to make the necessary showing to present the question of FWCS's alleged negligence to a jury. In essence, Tun's argument is that Mohr and Rhodes failed to abide by the school's supervision policy and as a result, Constantine was allowed to snap nude photos of the wrestling team. However, until this incident occurred, there was no suggestion that simply taking a shower in Wayne's locker room presented this type of danger to Tun or anyone else, or that Constantine had any propensities towards such an act, or that any mischief whatsoever was afoot. *See Norman*, 411 N.E.2d at 618; *Ashcraft*, 706 N.E.2d at 1105.

Indeed, since Constantine apparently took the four pictures in a matter of seconds, it is likely that even if the coaches had paid "perfect attention" to the wrestling team (*i.e.*, complied with the school's policy as Tun construes it), it still would not have prevented the incident from occurring. *Norman*, 411 N.E.2d at 618; *Ashcraft*, 706 N.E.2d at 1105. Indiana courts do not impose on teachers or coaches the impossible task of "observ[ing] every student at every instant...." *Norman*, 411 N.E.2d at 617. Indeed, even Tun does not suggest stationing coaches in locker rooms to actually watch teams shower and dress, a precaution indisputably beyond "ordinary and reasonable care," and the effectiveness of any lesser measure simply invites speculation. *Id.* at 618 ("To attempt to determine if closer attention by the teachers would have prevented this accident is to invite speculation.").

Finally, there is no showing that what happened to Tun was foreseeable. *Roe v. North Adams Comm. Sch. Corp.*, 647 N.E.2d 655, 660 (Ind.App.1995); *see also Ashcraft*, 706 N.E.2d at 1105. In *Roe*, lifeguarding students were videotaped by another student via a hidden camera in a school locker room. Once the tape was discovered, the lifeguarding students sued the school, alleging that the school had failed in its duty to provide locker room security. However, the Indiana Court of Appeals affirmed the trial court's grant of summary judgment, holding that the plaintiffs had failed to demonstrate that the school had a duty to foresee such an act, or that the school's alleged negligence proximately caused the plaintiffs' injuries. *Roe*, 647 N.E.2d at 660. These same compelling principles apply with equal force here.

Therefore, FWCS is entitled to summary judgment on the negligent supervision claim as a matter of law.

### D. The Individual Defendant Claims Under § 1983

#### 1. Tun's Procedural Due Process Claim Fails as a Matter of Law

Tun does not elaborate on who is responsible for allegedly depriving him of his procedural due process rights, although presumably his target is Platz, since he centers his argument on her *ex parte* con-

tact with Weicker, her resulting comment that Wayne officials should file for expulsion, and her refusal to allow Tun's counsel to see Constantine's written statement or to cross-examine him. (*See* Mem. in Opp. at 6–7.) Therefore, the Court will turn to those issues.

The basic question is whether the Defendants, particularly Platz, violated the Fourteenth Amendment, which prohibits state actors from depriving "any person of life, liberty, or property, without due process of law." *B.S. ex rel. Schneider v. Bd. of School Tr., Fort Wayne Community Schools*, 255 F.Supp.2d 891, 897 (N.D.Ind. 2003) (citing *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 616 (7th Cir.2002)). There is no dispute that Tun has a property interest in his free public education, *see* Ind. Const. art. 8, § 1 ("it shall be the duty of the General Assembly ... to provide, by law, a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all"); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Martin v. Shawano-Gresham School Dist.*, 295 F.3d 701, 705–06 (7th Cir.2002), so the question devolves to simply how much process Tun was due. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[o]nce it is determined that due process applies, the question remains what process is due").

■ In *Goss*, the Supreme Court first addressed what process is due in the school discipline context. Although *Goss* specifically limited its holding "to the short suspension, not exceeding 10 days," *Goss*, 419 U.S. at 584, 95 S.Ct. 729, it "nevertheless establish[ed] the minimum requirements for long-term expulsions as well." *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d, 920, 927 (6th Cir.1988). To comport with due process, suspension and expulsion procedures must provide the student with a meaningful opportunity to be heard. *Remer v. Burlington Area School Dist.*, 286 F.3d 1007, 1010–11 (7th Cir.2002) (citing *Linwood v. Bd. of Educ.*, 463 F.2d 763, 769–70 (7th Cir.1972)). The proceedings need not, however, take the form of "a judicial or quasi-judicial trial"; so long as the student is given notice of the charges against him, notice of the time of the hearing and a full opportunity to be heard, the expulsion procedures do not offend due process requirements. *Id.; see also Goss*, 419 U.S. at 581, 95 S.Ct. 729 (minimum due process requirements for suspension include "oral or written notice of the charges ... and, if he [the student] denies them, an explanation of the evidence the authorities have against him and an opportunity to present his side of the story").

■ Tun does not allege that he received inadequate notice, but he does contest whether he received a full opportunity to be heard. Therefore, the Court must apply the flexible, policy-oriented balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Newsome*, 842 F.2d at 923–24; *Caston v. Benton Public Schools*, 2002 WL 562638, at *3 (E.D.Ark. April 11, 2002); *Rippy v. Bd. of Sch. Trustees*, 2000 WL 689340, at *3 (S.D.Ind. Feb. 4, 2000). In *Mathews*, the Supreme Court explained that courts must consider (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of that interest through the procedures used by the state, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that an additional or alternative procedure would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

As to the first *Mathews* factor, it is clear that Tun has an important interest at

stake in this case. While Tun was eventually reinstated, he claims continuing harassment and suggests that his expulsion may "seriously damage his standing with [his] fellow pupils and [his] teachers[.]" *See Goss*, 419 U.S. at 575, 95 S.Ct. 729. However, Tun's interest is lessened because the record of his expulsion has been administratively removed, thereby alleviating the risk that his expulsion will interfere with his future education or employment. *Id.* Nevertheless, Tun has a legally viable interest in ensuring that his expulsion was warranted.

Turning to the next factor, Tun complains that Platz did not allow him to cross-examine Constantine and did not allow him to see a copy of Constantine's statement. However, as this Court previously noted, the clear weight of authority holds that a student facing expulsion does not have the right to cross-examine witnesses or even learn their identities. *B.S. ex rel. Schneider*, 255 F.Supp.2d at 897 (citing *Newsome*, 842 F.2d at 925); *Brewer ex rel. Dreyfus v. Austin Independent School Dist.*, 779 F.2d 260, 263 (5th Cir. 1985); *Caston*, 2002 WL 562638; *Witvoet v. Herscher Comm. Unit School Dist. No. 2*, 1998 WL 1562916, at *4 (C.D.Ill. May 27, 1998); *Smartt v. Clifton*, 1997 WL 1774874, at * 16 (S.D.Ohio Feb.10, 1997); *L.Q.A. ex rel. Arrington v. Eberhart*, 920 F.Supp. 1208, 1219 (M.D.Ala.1996), *aff'd*, 111 F.3d 897 (11th Cir.1997); *Coplin v. Conejo Valley Unified School Dist.*, 903 F.Supp. 1377 (C.D.Cal.1995). In the school discipline context, the value of cross-examining student witnesses is lessened because the veracity of a student account of misconduct is initially assessed by a school administrator who has, or has available to him, a particularized knowledge of the student's trustworthiness. Consequently, the process of cross-examining the student witness may often be duplicative of the evaluation process undertaken by the investigating school administrator. *Newsome*, 842 F.2d at 924.

In this instance, Mohr, who initiated the entire series of events, was familiar with all those involved and immediately made the assessment that Constantine, who Mohr described as a "very naive" foreign exchange student, would not have taken the photos of the boys, who Mohr knew to be jokesters, uninvited. (Mohr Dep. at 32–33.) This type of firsthand knowledge, augmented by school records and disciplinary histories, gives school administrators the necessary information to determine a student's truth and veracity. *Newsome*, 842 F.2d at 924. Thus, under the *Mathews* framework, the risk of an erroneous deprivation here, at least as far as the procedures employed are concerned, was very low.

Finally, the Court must weigh the value of providing Tun with Constantine's statement and the opportunity to cross-examine him against the burden that such a practice would place on the school administration. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *Newsome*, 842 F.2d at 924. As this Court recently noted, in light of the increasing challenges schools face in maintaining order and discipline, requiring them to permit the confrontation of student witnesses or even to disclose their identities in expulsion hearings is overly burdensome and unrealistic. *Wagner ex rel. Wagner–Garay v. Fort Wayne Community Schools*, 255 F.Supp.2d 915, 927 (N.D.Ind.2003) (citing *Newsome*, 842 F.2d at 924–25; *Caston*, 2002 WL 562638, at *5; *Coplin*, 903 F.Supp. at 1382; *Graham v. Knutzen*, 351 F.Supp. 642, 669 (D.Neb. 1972)). This is particularly true given that the purpose behind the administrative expulsion process is to avoid the formalistic trappings, complexity and cost of adversarial litigation. *Id.* (citing *Osteen v. Henley*, 13 F.3d 221, 225–26 (7th Cir.1993);

*Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 16 (1st Cir.1988)). Also, FWCS has a strong interest in protecting students who report their classmate's misconduct, given that "[t]hose students may be understandably reluctant to come forward with information if they are faced with the prospect of formal crossexamination by the offending student or his attorney," *Caston,* 2002 WL 562638 at *5, or the unsettling prospect of ostracism or even physical reprisals at the hands of their peers, *id.; Newsome,* 842 F.2d at 925; *Graham,* 351 F.Supp. at 666.

Thus, in balancing all the factors, the Defendants' interests in avoiding the administrative burdens of formalized expulsion proceedings and protecting student witnesses greatly outweighs the minimal value derived from providing Tun with Constantine's written statement and the opportunity to cross-examine him. After all, "[t]he question presented here is not whether the hearing was ideal, or whether its procedure could have been better. Rather, in all cases, the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual with the essential elements of due process." *Gorman,* 837 F.2d at 16. By that measure, Tun was accorded a full and fair opportunity to be heard.

■ Tun also attacks Platz's alleged conversation with Weicker and her expressed opinion that Wayne officials should file for expulsion. Of course, "[t]he final decision to terminate a governmental interest must be made by a neutral and detached decision-maker; those who function in judicial or quasi-judicial capacities must be impartial." *Butler v. Oak Creek–Franklin Sch. Dist.,* 172 F.Supp.2d 1102, 1115 (W.D.Wis.2001) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481–486, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665,

72 L.Ed.2d 1 (1982)). However, "[a]n official is not necessarily barred from being a decision-maker due to prior involvement in some aspects of a case, *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); absent evidence of particular bias or prejudgment, the same person or entity may first investigate and later adjudicate whether proscribed conduct occurred, *Withrow v. Larkin,* 421 U.S. 35, 53–55, 95 S.Ct. 1456, 43 L.Ed.2d 712, (1975)." *Butler,* 172 F.Supp.2d at 1115. Thus, school administrators who investigate allegations of misconduct against a student may participate in deliberations about whether the student should be disciplined, so long as they have no pre-existing animus against the student. *Id.* (citing *Newsome,* 842 F.2d at 927); *see also Brewer,* 779 F.2d at 264 ("A school administrator involved in the initiation and investigation of charges is not thereby disqualified from conducting a hearing on the charges . . .").

Nonetheless, it is a "a simple but fundamental tenet of due process [that] 'no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.'" *Butler,* 172 F.Supp.2d at 1115 (quoting *Trust & Inv. Advisers, Inc. v. Hogsett,* 43 F.3d 290, 295 (7th Cir.1994)). As a result, the government official charged with recommending a particular decision must not participate in making the actual decision, and the official who makes an initial decision must not participate in making the final decision. *Id.* "When review of an initial decision is mandated, the decision-maker must be other than the one who made the decision under review." *Withrow,* 421 U.S. at 58 n. 25, 95 S.Ct. 1456.

First, it cannot be overlooked that Platz's comment is equivocal at most; she does not comment on the merits of the charge and certainly did not decide to have

them filed. Indeed, her discussion with Weicker was apparently both the beginning and the end of her pre-filing involvement. There is no showing that Platz was ever charged with the responsibility of recommending that Tun actually be expelled (as that was Whitticker's duty), or that Whitticker, who made the initial decision to expel Tun, had any influence on Platz's final decision. *Butler,* 172 F. Supp 2d at 1115. In sum, all that Tun has shown is some tangential contact that does not strip Platz of the presumption that she was impartial (*see* Platz Supp. Aff. ¶ 6), and to otherwise suggest from an e-mail snippet that she prejudged the case simply invites jury speculation. *Withrow,* 421 U.S. at 53–55, 95 S.Ct. 1456. Consequently, this claim fails as a matter of law.

### 2. Tun Is Entitled To Summary Judgment on His Substantive Due Process Claims Against Platz and Whitticker In Their Individual Capacities

Tun contends that even if Constantine's version of the story is believed, what happened was not a "punishable offense" under FWCS's Behavior Code, and thus Whitticker violated his substantive due process rights by arbitrarily seeking his expulsion, and Platz did so by arbitrarily expelling him.

### a. Defining a Substantive Due Process Violation

To make out a deprivation of substantive due process, Tun must show that Whitticker and Platz's actions constituted an abuse of power that "shocks the conscience," *see, e.g., Dunn v. Fairfield Community High Sch. Dist. No. 225,* 158 F.3d 962 (7th Cir.

1998), a question of law in the Seventh Circuit, *Armstrong v. Squadrito,* 152 F.3d 564, 581 (7th Cir.1998); *Escatel v. Atherton,* 2001 WL 755280, at *6 n. 14 (N.D.Ill. 2001).

Therefore, the principal question becomes: what does "shocks the conscience" mean in the context of substantive due process, and how does it apply here? Clearly, negligent conduct is not enough. *Galdikas v. Fagan,* 342 F.3d 684, 690 (7th Cir.2003), (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"), *cert. denied,* — U.S. —, 124 S.Ct 1423, 158 L.Ed.2d 87 (2004), *overruled on other grounds by Spiegla v. Hull,* 371 F.3d 928 (7th Cir.2004). Nevertheless, "[i]n situations where actual deliberation is possible, conduct that is 'deliberately indifferent' may in certain circumstances 'shock the conscience[.]'" *Carter v. Simpson,* 328 F.3d 948, 952 (7th Cir.2003). Although the case at hand clearly involves a situation in which Platz and Whitticker both had ample time for "actual deliberation,"[7] the deliberate indifference standard is of little practical value as " '[d]eliberate indifference, in fact, is merely the manifestation in certain situations of a more general inquiry, which is whether the government conduct at issue shocks the conscience.'" *Bublitz v. Cottey,* 327 F.3d 485, 490 (7th Cir. 2003) (quoting *Schaefer v. Goch,* 153 F.3d 793, 797 (7th Cir.1998)) (internal quotation marks omitted).

 Perhaps the best formulation is simply that Tun must show that Whittick-

7. The photographs in question were taken on February 5 or 6, 2003 (each date is found in the record). Whitticker did not submit her written charge and request for expulsion until February 10, 2003. (Platz Aff. Ex. 2). Like-

wise, Platz conducted the expulsion hearing on February 18, 2003, and issued her ruling on February 24, 2003. (Platz Aff., Ex. 9–10). Thus, each had several days to deliberate on the propriety of Tun's expulsion.

er arbitrarily sought, and Platz arbitrarily ordered, his expulsion; as the Seventh Circuit observed in *Dunn,* 158 F.3d at 965, "[t]he touchstone of due process ... is 'protection of the individual against arbitrary action of government.'" (quoting *Lewis,* 523 U.S. at 845, 118 S.Ct. 1708). "'[O]nly the most egregious official conduct' is arbitrary in the constitutional sense." *Id.* (quoting *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708). An abuse of power is arbitrary if it "shocks the conscience," but Tun must also show that the official conduct here was "unjustifiable by any governmental interest." *Id.; see also Remer,* 286 F.3d at 1013.

Though the Supreme Court has unambiguously held that mere negligent conduct will not give rise to a substantive due process claim, it has not set forth a clear profile of what conduct will support such a claim. Rather, the Court has posited a spectrum in which negligence will not suffice, but "behavior at the other end of the culpability spectrum ... [will] most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis,* 523 U.S. at 849, 118 S.Ct. 1708. However, the Court cautioned that conduct giving rise to a substantive due process claim need not necessarily have been un-

dertaken with an intent to injure. *Id.* ("Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls. To be sure, we have expressly recognized the possibility that some official acts in this range may be actionable under the Fourteenth Amendment ....") (internal quotation marks, citation, and footnote omitted).

In short, Tun must show that this is the "rare [school discipline] case where there was no rational relationship between the punishment and the offense." *Brewer v. Austin Ind. Sch. Dist.,* 779 F.2d 260, 264 (5th Cir.1985) (internal quotation marks and citation omitted); *accord Rosa v. Connelly,* 889 F.2d 435 (2d Cir.1989); *Seal v. Morgan,* 229 F.3d 567 (6th Cir.2000); *James By and Through James v. Unified Sch. Dist. No. 512, Johnson County, Kan.,* 899 F.Supp. 530 (D.Kan.1995); *Gomes v. Univ. of Maine System,* 304 F.Supp.2d 117 (D.Me.2004).

### b. Tun's Substantive Due Process Rights Were Violated[8]

After clearing away most of the underbrush from Tun's case, the true basis for

---

8. In a previous order concerning Tun's substantive due process claim, the Court directed counsel to file briefs discussing, *inter alia,* the availability of Tun's state law remedies. Upon further review, however, it is apparent that the availability of those remedies is irrelevant to Tun's substantive due process claim. *See Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *see also Lunsford v. Bennett,* 17 F.3d 1574, 1583 n. 5 (7th Cir.1994) (holding that the requirement announced in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) that a plaintiff must exhaust all available state remedies before proceeding under § 1983 "does

not apply to violations of substantive constitutional guarantees.... *Parratt* does not apply to substantive due process violations"); *Draghi v. County of Cook,* 184 F.3d 689, 694 (7th Cir.1999) (holding that plaintiff could proceed with his substantive due process claim regarding his termination because "since this is a § 1983 action, Dr. Draghi need not show that the state law remedies are inadequate"); *accord Flaherty v. Marchand,* 2001 WL 1242884 (N.D.Ill. Oct. 17, 2001); *but see Galdikas,* 342 F.3d at 691 (applying the state law remedies test without discussing *Zinermon* or otherwise deciding that the test was applicable).

his suit becomes apparent: that Whitticker allegedly violated his substantive due process rights by initiating expulsion proceedings, and that Platz allegedly did so by expelling him. Tun's substantive due process argument is that, even under the Behavior Code's own terms, he could not have been expelled under Rule 24, because possession of pornography is not an offense that can result in expulsion, and that under Rule 22, "Inappropriate Sexual Behavior," he should not have been expelled because there is no evidence he violated that rule.

Thus, as the parties seemingly realize, the crux of this case is whether under any stretch of the imagination Tun engaged in "inappropriate sexual behavior," because he could not have been expelled for possession of pornography, even if the negatives could be deemed pornographic.

### i. A Rule 24 Behavior Code Violation Cannot Form the Basis for Expulsion

■ The Wayne Behavior Code specifies six levels of discipline, with the sixth (expulsion) being the most severe. (Platz Aff., Ex. 12 at 6–7.) Alongside each Rule in the Behavior Code is a chart specifying the minimum and maximum punishment level for each offense, such that a Rule 24 violation ranges from level two punishment (*e.g.*, detention) to level five (*e.g.*, school probation or placement in an alternative education program). Thus, under the very terms of the Behavior Code, expulsion was not a disciplinary option for Tun's alleged possession of pornography. (See *id.*, Ex. 12 at 12.)

Given the clear mandate of the Behavior Code, it is hard to understand how Tun could have been expelled for this alleged offense, particularly since Tun's attorney

explicitly argued the point at the expulsion hearing (*id.*, Ex. 9 at 7–8), and Platz recounted it in her decision, (*id.*, Ex. 10). In any event, apparently blind to what the Behavior Code provides, and heedless of the argument offered by Tun's attorney, Platz grounded her expulsion decision at least in part on Tun's alleged violation of Rule 24. However, this error, effectively imposing the death penalty in a non-capital case, although shocking, is otherwise harmless if Tun was nevertheless properly expelled for violating Rule 22 by engaging in "inappropriate sexual behavior." To that question the Court now turns.[9]

### ii. There Is No Evidence That Tun Violated Rule 22, Making His Expulsion So Clearly Wrong and Arbitrary That It "Shocks the Conscience."

■ Rule 22 of the Behavior Code prohibits students from "[p]articipating in inappropriate sexual behavior ... or public indecency on school property...." (Platz Aff., Ex. 12 at 12.) It is not exactly clear from Platz's findings whether she deemed Tun's actions to be "inappropriate sexual behavior" or "public indecency," but we do know that at least Whitticker believed it to be "public indecency." (*See* Whitticker Dep. at 7 ("[i]t was a general suspension with the nature of it being public indecency")).

Neither term is defined in the Behavior Code, nor is such particularity necessarily required. *Wiemerslage Through Wiemerslage v. Maine Township High Sch. Dist. 207*, 824 F.Supp. 136, 140 (N.D.Ill.1993) ("school disciplinary regulations need not be drawn with the same precision of a criminal statute"). Moreover, a school's definition of public indecency is not neces-

---

**9.** Under this analysis, the question of whether the negatives were pornographic is immaterial since Tun could not have been expelled even if they were.

sarily confined to how the State of Indiana defines that criminal offense. However, in this context it is a meaningful analog because Rule 22 falls under what the Behavior Code lists as "Law Violations," meaning that "FWCS Security ... will be notified, and the police may be contacted." (*See* Platz Aff., Ex. 12 at 11.)

At the time of the incident, Indiana defined "public indecency" and "indecent exposure" as follows:

(a) A person who knowingly or intentionally, in a public place:

(1) engages in sexual intercourse;

(2) engages in deviate sexual conduct;

(3) appears in a state of nudity; or

(4) fondles the person's genitals or the genitals of another person; commits public indecency, a Class A misdemeanor.

. . . . .

(b) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, ... or the showing of covered male genitals in a discernibly turgid state.

(c) A person who, in a place other than a public place, with the intent to be seen by persons other than invitees or occupants of that place:

(1) engages in sexual intercourse;

(2) engages in deviate sexual conduct; or

(3) fondles the person's genitals or the genitals of another person; where the person can be seen by persons other than invitees and occupants of that place commits indecent exposure, a class C misdemeanor.

I.C. § 35–45–4–1.[10]

Thus, to have engaged in public indecency, Tun must have knowingly or intentionally appeared "in a state of nudity" in a "public place." An examination of the photographs accompanying Platz's Affidavit (Platz Aff., Ex. 8) reveals that Tun is "in a state of nudity" as defined in the statute, I.C. § 35–45–4–1(b), and since he was taking a shower, we can infer either knowingly or intentionally so. However, the term "public place" is not statutorily defined, and thus, the question becomes whether a high school locker room shower is a public place. To answer that question, the Court turns to Indiana case law.

When construing an Indiana statute, "words are to be given their plain, ordinary, and usual meaning unless a contrary purpose is clearly shown by the statute itself." *Dept. Of Public Welfare, State of Indiana v. Couch,* 605 N.E.2d 165, 167 (Ind.1992). Thus, the Court may consider, for example, the dictionary definition of "public place." *Ashlin Transp. Services, Inc. v. Ind. Unemployment Ins. Bd.,* 637 N.E.2d 162, 167 (Ind.App.1994); *see also State v. Baysinger,* 272 Ind. 236, 397 N.E.2d 580, 582–83 (1979) (quoting with approval prior cases which used a dictionary to attempt to define "public"). Not surprisingly, a public place is defined as "[a] place to which the general public has a right to resort.... A place exposed to the public, and where the public gather together or pass to and fro." *Black's Law Dictionary* 1230–1231 (6th ed.1990).

Thus defined, we come to the common sense conclusion that a high school boys locker room, let alone its adjoining shower, is not a public place. FWCS believes this too, because Wayne had a gym and locker room policy, adopted at Whitticker's urging, that prohibited, for example, "onlookers" and "opposite gender managers." (*See* Exhibit to Rhodes Dep.)

---

**10.** A few months after the events in this case, the statute was immaterially amended.

This conclusion is also supported by cases interpreting the public indecency statute. For example, in *Chubb v. State*, 640 N.E.2d 44 (Ind.1994), an officer observed a man masturbating in a closed toilet stall at a shopping mall. After conviction, the Indiana Supreme Court noted that the stall was "enclosed by partitions of sufficient height so that users' conduct or condition is not visible to the public eye," meaning that the stall "is *not* a public place." *Id.* at 47; *see also Lasko v. State*, 409 N.E.2d 1124 (Ind.App.1980) (holding that a locked room in massage parlor was not a public place because it was not reasonably foreseeable that the general populace would be able to see what occurred in the room); *Commonwealth v. Beauchemin*, 410 Mass. 181, 571 N.E.2d 395, 397 (1991) (holding that a faculty lounge is not a public place because there is little likelihood that conduct there will be observed by a passerby).

After *Chubb*, Tun's status is clear under Indiana law. Tun was taking a shower in a place explicitly designated and designed for that activity and was, naturally, nude while doing so. To suggest that this conduct constitutes public indecency is the same as saying that everyone who showers at a YMCA or athletic club commits a criminal act in the State of Indiana. *See Chubb*, 640 N.E.2d at 47 ("The defendant's genital nudity in the closed stall did not constitute public indecency. To hold otherwise would effectively render the ordinary use of a public restroom a crime").

Similarly, if "inappropriate sexual behavior" is read to mean "indecent exposure," Tun did not commit that offense either. On the date of the incident, Indiana law did not make mere nudity in a non-public place a basis for that offense (as opposed to "sexual intercourse" or "deviate sexual conduct" or fondling). I.C. § 35–45–4–1(c). Consequently, there is nothing in the record to suggest that Tun, by simply taking a shower, engaged in indecent exposure.

Finally, apart from the statutory analogs, there is nothing that would allow the Court to conclude that Tun engaged in what FWCS generally defines as "inappropriate sexual behavior," no matter how the phrase is defined. Indeed, no one could possibly conclude that merely "allowing" one's photo to be taken in the shower equates with something sexual. (*See* Platz Aff., Ex. 10 ("Tun allowed ... [Constantine] to take photographs of him while nude in the boy's locker room")). This is particularly true here because, as the photos reveal, Tun is not so much "posing" as trying to cover his nudity.[11]

Accordingly, this is one of those "rare [school discipline] case[s] where there [is] no rational relationship between the punishment and the offense." *Brewer*, 779 F.2d 260, 264.

On this record, even if viewed in a light most favorable to Platz and Whitticker, there was clearly no "offense" at all. Indeed, if Platz's decision says anything, it is that she essentially acquitted Tun of any violation of Rule 22 ("Tun allowed ... [Constantine] to take photographs of him while nude in the boy's locker room. [Tun] did not ask [Constantine] to stop taking pictures[,]") but then sentenced him to expulsion nonetheless. (*See* Platz Aff., Ex. 10) Moreover, in the limited factual circumstances of this case, no overriding governmental interest is present that would make Whitticker and Platz's decisions justifiable. *Dunn*, 158 F.3d at 965.

11. Given that he was taking a shower, the Court is at a loss to understand what Tun could have done to avoid having his picture taken, or perhaps more importantly, what he could have done to avoid appearing nude.

This case is not like *Wood,* 420 U.S. at 323, 95 S.Ct. 992, where once the school regulation was properly interpreted there was "no absence of evidence" to prove the charge. Rather, Tun's situation is something the Supreme Court did not have to face in *Wood,* but yet it is on familiar constitutional terrain, because it falls neatly in line with *Thompson v. City of Louisville,* 362 U.S. 199, 206, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (holding that "it [is] a violation of due process to convict and punish a man without evidence of his guilt"), and such other cases as *Harris v. United States,* 404 U.S. 1232, 1233, 92 S.Ct. 10, 30 L.Ed.2d 25 (1971) ("it is beyond question, of course, that a conviction based on a record lacking any relevant evidence as to a crucial element of the offense charged would violate due process"), and *Vachon v. New Hampshire,* 414 U.S. 478, 479, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974). Since the Supreme Court has extended this fundamental principle of due process to administrative proceedings, we apply it here. *See Int'l. Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) (addressing the expulsion of a union member during union disciplinary proceedings).

In short, as there was no evidence to support either Whitticker's charge or Platz's finding that Tun engaged in some form of inappropriate sexual conduct, their acts were arbitrary, shocking to the conscience, and a violation of Tun's substantive due process rights as a matter of law.

### 3. Platz and Whitticker are Not Entitled to Qualified Immunity

█ The Court's finding that Platz and Whitticker violated Tun's substantive due process rights is not the end of the matter, however, as Platz and Whitticker both claim they are entitled to qualified immunity. The qualified immunity doctrine grants immunity from a suit for damages under § 1983 to governmental officials, such as school officials, who have performed discretionary functions, if their conduct did not violate clearly established rights then known to a reasonable official. *Billings v. Madison Metropolitan School Dist.,* 259 F.3d 807, 816 (7th Cir.2001); *Ulichny v. Merton Cmty. Sch. Dist.,* 249 F.3d 686, 706 (7th Cir.2001); *Oliver,* 919 F.Supp. at 1216–1217 (N.D.Ind.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In this circuit, the question of a defendant's qualified immunity is a question of law for the Court to decide. *Warlick v. Cross,* 969 F.2d 303, 305 (7th Cir.1992).

A qualified immunity analysis entails a purely objective inquiry to determine whether, at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented. *See Wollin v. Gondert,* 192 F.3d 616, 622 (7th Cir.1999) (holding that "a qualified immunity analysis entails a purely objective inquiry to determine whether at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented" (citations omitted)); *Harrell v. Cook,* 169 F.3d 428, 431 (7th Cir.1999) (noting that "[q]ualified immunity depends on the objective legal reasonableness of the defendants' actions, not on their subjective motivations"). "If the rights were clearly established, the official may be liable for monetary damages and the suit proceeds to the next stage. If the rights were not clearly established, then the official is immune from suit and the claim is dismissed." *Jacobs v. City of Chicago,* 215 F.3d 758, 766 (7th Cir.2000) (citing *Richardson v. McKnight,* 521 U.S. 399, 403, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)). Finally, it is the plaintiff's burden to demonstrate that a right is clearly established. *Jacobs,* 215 F.3d at 766.

In determining whether a right was clearly established at the time the defendants acted, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Billings*, 259 F.3d at 816 (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Supreme Court has stated that the "relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In undertaking this inquiry, the particular facts and the circumstances confronting the official must be considered. *Billings*, 259 F.3d at 815. "It is not necessary for liability, however, that an identical factual situation had been legally decided adverse to the officer." *Id.* (quoting *Ulichny*, 249 F.3d at 706); *see also Finn v. New Mexico*, 249 F.3d 1241, 1250 (10th Cir.2001) ("[T]here need not be binding precedent on 'all fours' with the current case ... we require some, but not identical, correspondence between the cases cited and the factual situation in the case at hand"); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir.2001) ("[T]he absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established.").

To shorten the analysis, in accordance with *Burgess v. Lowery*, 201 F.3d 942, 946 (7th Cir.2000), the test formulated with particular applicability to this case is: whether a reasonable school official in the position of Platz or Whitticker, considering all relevant sources of guidance to the law, might have thought it reasonably possible that the Seventh Circuit Court of Appeals or eventually the United States Supreme Court, would hold that a student could be expelled from school for "public indecency"

or "inappropriate sexual behavior" for merely "allow[ing] another ... student to take photographs of him while nude in the boy's locker room [shower.]" (Platz Aff., Ex. 10, 12.) To ask that question is to answer it.

As discussed *supra*, nothing in the record contains even a hint that Tun engaged in any conduct which could even remotely be construed as sexual in nature, and indeed, Platz never found that he had done so. Furthermore, the clearly established law does not support a conclusion (although Platz did not expressly make this finding) that showering nude in a locker room constitutes public indecency.

Consequently, both Whitticker and Platz either knew, or reasonably should have known, *Wood*, 420 U.S. at 322, 95 S.Ct. 992, that there at least had to be "some evidence" of a Behavior Code violation before Tun could be expelled or otherwise disciplined, and correspondingly, that to expel him for a violation for which there was no evidence violated a clearly established fundamental right of due process, *see, e.g., Thompson*, 362 U.S. at 206, 80 S.Ct. 624. Thus, neither is entitled to qualified immunity as a matter of law.

## V. CONCLUSION

For the reasons previously set forth, it is hereby **ORDERED** that Tun's motion for summary judgment against Whitticker and Platz individually on his substantive due process claim is **GRANTED** and the Defendants' motion for summary judgment on the substantive due process claim is **DENIED**. The Defendants' motion for summary judgment is **GRANTED** as to Tun's claims against FWCS, Mohr, and Rhodes, and also as to Tun's claims against Whitticker and Platz to the extent they are being sued in their official capacities.

This matter is now set for a final pretrial conference on August 30, 2004, at 3:00 p.m. Counsel are to submit a proposed form of pretrial order by August 23, 2004. Counsel and the parties are to be present in person. Moreover, as the Court assumes that Tun has now reached the age of majority, giving him the capacity to sue in his own name, and given that his parents do not assert a claim of their own, he can now be substituted as the real party in interest. *See* Fed.R.Civ.P. 17.